Walter L. NIXON, Jr., Petitioner,

v.

UNITED STATES of America, Respondent.

No. H88–0052(G).

United States District Court, S.D. Mississippi, Hattiesburg Division.

Dec. 19, 1988.

James M. Cole, Public Integrity Section, Crim. Div., U.S. Dept. of Justice, Washington, D.C., for respondent.

Boyce Holleman, Michael B. Holleman, Boyce Holleman, A Professional Ass'n, Gulfport, Miss., William H. Jeffress, Jr., David Overlock Stewart, Miller, Cassidy, Larroca & Lewin, Washington, D.C., for petitioner.

## TABLE OF CONTENTS

| | | PAGES |
|---|---|---|
| A. | **Introduction** | 543–544 |
| | 1. The Grand Jury Indictment | 543 |
| | 2. Section 2255 Grounds for Relief | 543–544 |
| | 3. Section 2255 Hearing Evidence | 544 |
| | 4. Section 2255 Legal Standards | 544–545 |
| B. | **Factual Background** | 544–551 |
| C. | **Trial Evidence Relating to Counts III and IV** | 551–552 |
| D. | **Section 2255 Hearing Record and Credibility of Witnesses** | 552–554 |
| E. | **Grounds 1 and 2: Failure to Disclose Favorable Evidence and Knowing Use of False Testimony** | 554–561 |
| | 1. Petitioner's Allegations | 554–555 |
| | 2. Motion to Amend | 555–556 |
| | 3. Failure to Disclose Favorable Evidence—Legal Standards | 556–557 |
| | 4. Knowing Use of False Testimony—Legal Standards | 557 |
| | 5. Promises and Inducements to Witnesses | 557–558 |
| | (1) The pardon | 557 |
| | (2) Help for Drew | 557–558 |
| | (3) Sentencing recommendation | 558 |
| | (4) Dismissal of gratuity charge | 558 |
| | 6. Undisclosed Documents | 559–560 |
| | 7. False Testimony | 560–561 |
| F. | **Ground 3: Jencks Act Violations** | 561–564 |
| | 1. Petitioner's Allegations | 561 |
| | 2. Jencks Act—Legal Standards | 561–562 |
| | 3. Prosecutor's Outline | 562–563 |
| | 4. Baltar's Chronology | 562–563 |
| | 5. Baltar's Notes | 563–564 |
| G. | **Ground 4: Perjury Trap** | 564–567 |
| | 1. Petitioner's Allegations | 564 |
| | 2. Perjury Trap—Legal Standards | 564–565 |
| | 3. Discussion | 565–567 |

PAGES

H. **Ground 5: Challenges to Prosecution** ............................... 568–572

 1. Petitioner's Allegations ........................................... 567–568
 2. Prosecutorial Misconduct ......................................... 568–569
 3. Prosecutorial Vindictiveness....................................... 569–570
 4. Bad Faith Prosecution............................................ 569–571
 5. Selective Prosecution ............................................ 570–571
 6. Outrageous Government Conduct .................................. 571–572

I. **Conclusion** ...................................................... 572–573

MEMORANDUM

NANGLE, District Judge, Sitting by Designation.

The motion of Petitioner Walter L. Nixon, Jr., to vacate his conviction and sentence, pursuant to 28 U.S.C. § 2255, is before the Court for a decision on the merits after an evidentiary hearing.

A. *Introduction.*

1. The Grand Jury Indictment.

On August 29, 1985, a special federal grand jury for the Southern District of Mississippi in Hattiesburg returned a four-count indictment against Petitioner who was then the Chief Judge of that Court. The Hattiesburg grand jury charged Petitioner with four offenses. Count I alleged the acceptance of an illegal gratuity, in violation of 18 U.S.C. § 201(g), based upon Petitioner's receipt of certain mineral royalty investments from Wiley Fairchild, a Hattiesburg businessman. Counts II, III and IV alleged perjury before the same grand jury, in violation of 18 U.S.C. § 1623. The trial jury returned verdicts of not guilty on Counts I and II, but guilty on Counts III and IV. The late Honorable James H. Meredith, the United States District Judge who tried the case, sentenced Petitioner to concurrent terms of five years imprisonment on each of the two perjury counts. The conviction and sentence were affirmed on direct appeal. *United States v. Nixon,* 816 F.2d 1022 (5th Cir.), *reh'g denied,* 827 F.2d 1019 (5th Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 749, 98 L.Ed.2d 762 (1988).

2. Section 2255 Grounds for Relief.

Petitioner thereafter filed the instant motion to vacate his conviction and sentence pursuant to 28 U.S.C. § 2255. He raises five grounds for post-conviction relief:

(1) the government's failure to disclose favorable materials before trial;

(2) the government's knowing use of false testimony;

(3) the government's failure to disclose statements of witnesses as required by the Jencks Act;

(4) the government's creation of a perjury trap during the grand jury proceedings; and

(5) the government's prosecutorial abuse and misconduct.

On August 5, 1988, Petitioner moved to amend his second ground for relief to add an additional specification of the government's knowing use of false testimony. On August 18, 1988, the Court denied this motion to amend. Thereafter, Petitioner moved for reconsideration, which the Court took under advisement. On August 29 and 30, 1988, an evidentiary hearing was held in

Jackson, Mississippi, on the first three grounds.[1]

### 3. Section 2255 Hearing Evidence.

At the § 2255 evidentiary hearing, John Baltar, Wiley Fairchild, Barry Hess, and Michael Fawer testified for Petitioner. Jan Little, Reid Weingarten, H. Marshall Jarrett, Weldon Kennedy, Kenneth White-Spunner, Jr., and Donald Lawless testified for the United States. The parties submitted extensive pre- and post-hearing briefs and many documents including grand jury transcripts, the trial transcript, the post-trial motion hearing transcript and the House Sub-Committee impeachment hearing transcript.

### 4. Section 2255 Legal Standards.

The Court has examined Petitioner's five grounds for post-conviction relief in the context of the narrow scope of collateral attack permitted by § 2255. A § 2255 proceeding is not a retrial of the case. Petitioner is entitled to post-conviction relief pursuant to § 2255 only if he establishes a jurisdictional or constitutional error, or an error of law which is so fundamental that it inherently results in a complete miscarriage of justice or in a proceeding inconsistent with the rudimentary demands of fair procedure. *United States v. Addonizio*, 442 U.S. 178, 185–186, 99 S.Ct. 2235, 2240–41, 60 L.Ed.2d 805 (1979); *United States v. Timmreck*, 441 U.S. 780, 784, 99 S.Ct. 2085, 2087, 60 L.Ed.2d 634 (1979); *Hill v. United States*, 368 U.S. 424, 428, 82 S.Ct. 468, 471, 7 L.Ed.2d 417 (1962). On his claims for relief, Petitioner has the burden of sustaining his factual contentions by a preponderance of the evidence. *United States v. Bondurant*, 689 F.2d 1246, 1251 (5th Cir. 1982); *Wright v. United States*, 624 F.2d 557, 558 (5th Cir.1980).

### B. *Factual Background.*

At the outset, it should be noted that this is not a typical § 2255 proceeding. Petitioner has made allegations which relate to the government's motives in investigating him, impaneling a special grand jury, propounding certain questions to him before the grand jury and eventually prosecuting him.

The evidence relating to the two perjury counts in issue is quite limited. However, in order to fully consider Petitioner's allegations, this Court must examine a complex factual background beyond the actual scope of the trial. Three separate sets of events—the Petit Bois Island condemnation proceedings, the Hattiesburg Airport drug bust followed by the Drew Fairchild criminal prosecution, and Petitioner's mineral royalty investments with Wiley Fairchild—combine to form this background. The following is an organized chronology of these events.

1) In 1979, Petitioner contacted Hattiesburg attorney Carroll Ingram and asked Ingram to investigate the possibility of Petitioner making an oil investment with Ingram's client, Wiley Fairchild, a Hattiesburg businessman and the president of Fairchild Construction Co.

2) On August 4, 1980, federal and local Forrest County, Mississippi, law enforcement agents seized an airplane carrying marijuana at the Hattiesburg Municipal Airport.[2] Drew Fairchild, the son of Wiley Fairchild, was one of the managers of the airport and was an active participant in the marijuana smuggling conspiracy. On August 19, 1980, a federal grand jury returned indictments against three of the marijuana smugglers, but not against Drew Fairchild. Drew and his attorney, Bill Porter, approached Forrest County

---

**1.** No evidentiary hearing was held on Petitioner's fourth and fifth grounds for relief, because the Court concluded that Petitioner's initial showing in support of those two grounds was

insufficient to warrant § 2255 post-conviction relief.

**2.** Hattiesburg is in Forrest County, Mississippi.

District Attorney Paul H. "Bud" Holmes to discuss Drew's situation. Holmes referred Drew and Porter to George Phillips, the U.S. Attorney prosecuting the three other marijuana smugglers. On November 19, 1980, Drew and Phillips entered into a written "Memorandum of Understanding" wherein they agreed that Drew would cooperate with the federal government in its prosecution of the other marijuana smugglers, would plead guilty to felony charges, would pay a $15,000 fine, and would be sentenced to five years probation.

3) In early 1981, Wiley Fairchild's extensive investment portfolio included three certain mineral royalty interests. On February 25, 1981, at Wiley's direction, Robert L. "Skip" Jarvis, his employee at Fairchild Construction Co., prepared a set of royalty conveyance documents for these three mineral royalty interests. In early March 1981, again at Wiley's direction, Jarvis prepared a second set of documents conveying the same three mineral royalty interests to Petitioner. Wiley executed the second set of royalty conveyance documents in early March 1981. However, the documents were backdated to reflect an execution date of February 25, 1980. Upon receipt of the executed documents, Ingram prepared three promissory notes totaling $9,500, reflecting a debt from Petitioner to Wiley Fairchild. Petitioner thereafter executed the promissory notes in early March 1981, although they also were backdated to reflect an execution date of February 25, 1980.

4) In March 1981, attorney Porter sued Drew Fairchild to collect a $10,000 legal fee for representing Drew in the plea negotiations with federal prosecutor Phillips. In July 1981, Wiley Fairchild paid Porter $2,669.19 of the fee. Porter was dissatisfied with this partial payment and complained to Holmes about his inability to collect his full legal fee from Drew. In order to determine what he could do to help Porter collect his full legal fee from Drew, Holmes called U.S. Attorney Phillips to discuss the status of the Drew Fairchild criminal case. By this time, Phillips had concluded that Drew had breached their plea agreement by not cooperating with the federal law enforcement officials. Thus, Phillips had already decided to prosecute Drew federally for his role in the marijuana smuggling conspiracy. Holmes offered to take over the prosecution of Drew and to indict Drew locally in Forrest County Circuit Court. Phillips agreed. On August 26, 1981, the Forrest County grand jury returned an indictment against Drew Fairchild and Robert Watkins, the pilot of the marijuana smuggling airplane. On September 3, 1981, Drew was arraigned in Forrest County Circuit Court, represented by Porter. Porter demanded the remainder of his fee. On September 3, 1981, Wiley Fairchild paid Porter $7,500.

5) In 1980, the United States government instituted condemnation proceedings in the United States District Court for the Southern District of Mississippi to add Petit Bois Island to the Gulf Island National Seashore. From August 23, through early September 1981, Petitioner presided over an eight-day trial to determine the value of Petit Bois Island. The United States valued Petit Bois Island at $330,000. John Stocks and Eugene Lewis of Tallahassee, Florida, the principal owners of Petit Bois Island and representing all the landowners, valued Petit Bois Island at $6.6 million.

6) On January 12, 1982, Drew Fairchild pled guilty in Forrest County Circuit Court to the marijuana smuggling charge. In a plea agreement with Holmes, Drew agreed to cooperate with Forrest County law enforcement officials in the prosecution of Watkins. Holmes agreed that Drew would receive a sentence of five years probation and a $5,000 fine. Drew Fairchild's sentencing was scheduled for March 19, 1982,

but was continued to accommodate Drew's medical condition.

7) On March 29, 1982, Petitioner rendered a $6.1 million judgment in favor of the landowners and against the United States in the Petit Bois Island condemnation proceedings. The United States filed a motion for a new trial based upon newly discovered evidence, which was denied by Petitioner.

8) In May 1982, Robert Watkins became a fugitive. As a result, and because Holmes wanted to ensure Drew Fairchild's cooperation in Watkins' prosecution, Drew's criminal sentencing was continued several times during the summer of 1982. In October 1982, Watkins was apprehended in Florida and Mississippi began extradition proceedings. On December 23, 1982, on Holmes' motion, Forrest County Circuit Court Judge Jack B. Weldy ordered Drew Fairchild's criminal case "passed to the files," that is, placed in inactive status but not dismissed. This step was taken to toll a Mississippi sentencing deadline so that Drew's sentencing could be delayed until after Watkins' trial. The facts suggest that passing Drew's case may also have been done to impress Wiley Fairchild. In January 1983, Judge Richard W. McKenzie replaced Judge Weldy on the Drew Fairchild criminal case. Also in January 1983, Watkins was extradited to Mississippi. As a result, on January 26, 1983, one month after it was "passed to the files," Drew's criminal case was reinstated to the active docket. However, there was no activity on Drew's case during the remainder of 1983.

9) In March 1983, the FBI in Tallahassee, Florida, received information indicating that Stocks and Lewis had fraudulently inflated the value of Petit Bois Island during the condemnation proceedings before Petitioner. This information did not implicate Petitioner in any misconduct in the condemnation proceedings. A federal grand jury in the Northern District of Florida began investigating the charges of fraud by Stocks and Lewis. The United States filed a motion for post-judgment relief in the Petit Bois Island condemnation proceedings. On July 21, 1983, Petitioner denied the United States' motion because it was not timely filed. The United States then moved for an *in camera* hearing in which it would demonstrate that Stocks' and Lewis' evidence at the condemnation trial had involved a fraud on the court. The United States refused to disclose this evidence to Stocks and Lewis. After two hearings in September 1983, Petitioner denied the United States' motion and refused to review the evidence *in camera*.

10) On November 3, 10, and 17, 1983, Robert Jarvis, who had left Wiley Fairchild's employ in May 1983, placed anonymous telephone calls to the FBI office in Pascagoula, Mississippi. In these telephone calls, Jarvis alleged that Wiley Fairchild had conveyed certain mineral royalty interests to Petitioner in order to obtain Petitioner's aid in the handling of Drew's criminal case. Jarvis told the FBI that the royalty conveyance documents had been executed after the Hattiesburg Airport drug bust, but had been backdated to reflect execution dates prior to the drug bust. Jarvis alleged that this backdating had occurred so that it would appear that Petitioner had not obtained the mineral royalty interests in connection with Drew's criminal problems. Jarvis also alleged that the Petitioner's promissory notes were not made as part of the transaction, but rather were made after the fact.

11) In early November 1983, attorney Porter was killed in an airplane crash. One morning in late November or early December 1983, at approximately 6:00 a.m., Holmes telephoned Judge McKenzie. Within an hour, Holmes picked up McKenzie and drove him to Wiley Fairchild's office. There, Holmes told Judge McKenzie and Wiley Fairchild that his term as Forrest County District Attorney was due to

expire in January 1984, that he was going to be replaced by Glen L. White, and that he wanted to clear up some cases before he left office. Holmes and Wiley generally discussed Drew's plea agreement and Holmes asked Wiley whether Drew wanted to go through with his sentencing. Wiley told Holmes to put Drew's criminal case on a back burner and to let it simmer. In January 1984, Glen L. White replaced Holmes as Forrest County District Attorney. There was no activity in Drew's criminal case during 1984, though the case was active and had not been dismissed.

12) The federal fraud investigation of Stocks and Lewis uncovered information indicating that Petitioner, Stocks, and Lewis had been at the same social gathering some time prior to the Petit Bois Island condemnation trial. In January 1984, the U.S. Attorneys for the Northern District of Florida and the Southern District of Mississippi determined that Petitioner could be a witness in the fraud investigation and that, if a fraud had been committed on the court, the fraud offense would have occurred in Mississippi where the court was located. In January 1984, the U.S. Attorney for the Northern District of Florida discussed the handling of the Petit Bois Island fraud investigation with his superiors in the Criminal Division of the Justice Department in Washington, D.C. The Public Integrity Section of the Criminal Division took over the Petit Bois Island fraud investigation in February, 1984, and transferred it to the Southern District of Mississippi.

13) In March 1984, Jarvis came forward and identified himself to the FBI as the anonymous telephone informant from November 1983. Jarvis agreed to cooperate with the United States and, on April 18, 1984, Jarvis consensually recorded a meeting with Wiley Fairchild.

14) On April 19, 1984, attorney Reid Weingarten of the Public Integrity Section interviewed Petitioner in his chambers in Biloxi, Mississippi. In response to one of Weingarten's questions, Petitioner stated that Holmes had not ever discussed the Drew Fairchild criminal case with him.

(April Interview Transcript [hereinafter "Int. Tr."] at p. 28).

15) In May 1984, the United States requested the impaneling of a special federal grand jury to investigate whether there was any impropriety in Petitioner obtaining the mineral royalty interests from Wiley Fairchild and whether there was any connection between those investments and the handling of the Drew Fairchild criminal case. A special federal grand jury was impaneled in Hattiesburg on July 18, 1984.

16) Petitioner voluntarily appeared and testified before the special federal grand jury in Hattiesburg on July 18, 1984. Midway through the grand jury appearance, Weingarten asked:

Did [Holmes] ever discuss the Drew Fairchild case with you?

(Nixon Gr.J. Tr. at p. 47, l. 25, through p. 48, l. 1). Petitioner answered:

No, not to the best of my recollection. I think I would recall if he had.

(Nixon Gr.J. Tr. at p. 48, ll. 2–3). This testimony was the basis for Count III of the indictment against Petitioner. Toward the end of Petitioner's grand jury appearance, Weingarten stated:

All right. Judge, do you have anything you want to add?

(Nixon Gr.J. Tr. at p. 75, ll. 14–15). Petitioner proceeded to make a lengthy narrative statement. (Nixon Gr.J. Tr. at p. 75, l. 17, through p. 79, l. 16). Midway through this narrative statement, Petitioner stated:

Now, I have had nothing whatsoever officially or unofficially to do with the Drew Fairchild criminal case in federal court or state court ... I have never handled any part of it, never had a thing to do with it at all and never talked to anyone, state or federal, prosecutor or judge, in any way [to] influence anybody with respect to this case.

(Nixon Gr.J. Tr. at p. 76, ll. 10–13 & p. 76, l. 23 through p. 77, l. 1). This testimony was the basis for Count IV. Count II (the perjury count for which the jury returned a not guilty verdict) was based upon Petitioner's testimony that Wiley Fairchild had not ever discussed the Drew Fairchild criminal

case with him, and had not ever asked him to do anything about that criminal case. (Nixon Gr.J. Tr. at p. 50, ll. 9–23).

17) Wiley Fairchild appeared and testified before the federal grand jury on July 18 and 19, 1984. Holmes appeared and testified before the grand jury in July and September, 1984.[3] On September 6, 1984, the grand jury indicted Wiley Fairchild on one count of paying an illegal gratuity to Petitioner in the form of the mineral royalty interests and on one count of perjury based upon Fairchild's testimony before the grand jury.

18) On October 30, 1984, Mississippi Attorney General Ed Pittman appeared at the Jackson, Mississippi, FBI offices and met with Special Agent in Charge Weldon Kennedy. Pittman advised Kennedy that John Baltar, Wiley Fairchild's assistant, had contacted Pittman and had asked Pittman to discuss certain information with Kennedy. According to Pittman, Baltar:

> indicated that Mr. [Wiley] FAIRCHILD has other significant information concerning the activities of Judge NIXON and others which he is willing to provide to the FBI if the Government will negotiate with him concerning the case on which he has been indicted. For example, BALTAR mentioned that on one occasion Mr. [Wiley] FAIRCHILD had a telephone call from BUD HOLMES who was then District Attorney in Forrest County, M[ississippi]. HOLMES put extreme pressure on Mr. [Wiley] FAIRCHILD to go through with a transfer of royalties in some oil and gas wells to Judge NIXON. HOLMES indicated to [Wiley] FAIRCHILD that this would be important if the case concerning DREW

FAIRCHILD were to be disposed of with the least amount of problems for DREW FAIRCHILD. Judge NIXON was also on an extension during this phone call, and HOLMES further indicated that it really didn't matter whether the case on DREW FAIRCHILD were handled Federally or locally in Hattiesburg. On the one hand if the case were Federally handled, Judge NIXON would be able to take care of the matter, and if it were handled locally, BUD HOLMES would be able to handle the matter. HOLMES further indicated that after all he did what Judge NIXON told him to do.

(Gov't. Exh. S). Agent Kennedy relayed the above information to attorney Reid Weingarten. Weingarten directed Kennedy to tell Pittman to tell Baltar that Baltar should establish direct contact with Kennedy.

19) Later, on October 30, 1984, Baltar telephoned Agent Kennedy and stated that Wiley Fairchild wanted to cooperate with the government and that he was seeking immunity in exchange for that cooperation. Baltar indicated that Fairchild had information concerning:

> a telephone call to WILEY FAIRCHILD from District Attorney BUD HOLMES with United States District Judge NIXON also on the line. This call had something to do with the handling of the prosecution of WILEY FAIRCHILD's son, DREW FAIRCHILD. * * *

[Baltar] also reiterated that from the very outset of this case, Mr. [Wiley] FAIRCHILD was under extreme pressure by BUD HOLMES and others to transfer royalties to Judge NIXON. Al-

---

**3.** During these grand jury appearances, neither Holmes nor Wiley Fairchild nor Petitioner revealed the following (which at the time was unknown to the United States and to the grand jury):
Sometime after the Hattiesburg Airport drug bust and after the transfer of the mineral royalty interests from Wiley Fairchild to Petitioner, Petitioner visited Wiley Fairchild in Fairchild's office. During that visit, Wiley told Petitioner that he thought that he was being blackmailed in connection with Drew's criminal case. After that visit, Petitioner and Holmes went to Holmes' farm. Either enroute to or at Holmes'

farm, Petitioner and Holmes had a conversation wherein Drew's criminal case was mentioned. From Holmes' farm, either Holmes or Petitioner then placed a telephone call to Wiley Fairchild. Both Holmes and Petitioner spoke to Wiley during this telephone call.
At Petitioner's trial, Wiley Fairchild, Holmes, and Petitioner testified that these visits, conversations, and the telephone call occurred. They disagreed on certain details, such as the date of the visits and the telephone call and the precise content of the conversations. *See* Section C below.

though FAIRCHILD did not realize by making such payments he was doing anything wrong, he felt that the payments were being extorted from him due to the fact that his son, DREW FAIRCHILD, was subject to possible prosecution by the Federal Government as well as by the State of Mississippi.

(Gov't. Exh. T).

20) On November 1, 1984, in the FBI office in Jackson, Wiley Fairchild made a plea bargain proffer of evidence to the United States. The United States was represented by Reid Weingarten, H. Marshall Jarrett (Weingarten's superior in the Public Integrity Section) and Agent Kennedy. Wiley Fairchild was represented by his attorney, Wallace Gunn, and was accompanied by Baltar. In his proffer, Wiley stated that Carroll Ingram had asked him to put Petitioner in a profitable investment. Fairchild said that he then did so out of fear for his son's criminal liability. Thereafter, in response to perceived blackmail threats by Bob Royals, Drew's partner at the Hattiesburg Airport, and by attorney Porter about Drew's case, Wiley told Ingram to bring Petitioner to his office. Fairchild stated that one afternoon thereafter Ingram did so. Wiley told Petitioner about his blackmail concerns. Wiley stated that later that evening Petitioner telephoned him and said, "Wiley ... the man that we talked about this evening, I am over at his house.... I've talked to him and things are going to be all right." Petitioner gave the telephone to Holmes who told Wiley, "Wiley, when this man asks me to do something, ... I don't ask no questions, I just do it." (Pet. Exh. No. 12 at pp. 6–9).

21) After the proffer, Wiley Fairchild and the United States reached a plea agreement which provided: Fairchild would plead guilty to the gratuity charge; the United States would dismiss the perjury charge; and the United States would make Fairchild's cooperation known to the sentencing judge. On November 26, 1984, as agreed, Wiley Fairchild pled guilty to the gratuity charge. On November 28, 1984, Wiley testified for a second time before the Hattiesburg federal grand jury. The following is a brief summary of Wiley Fairchild's testimony during his second grand jury appearance:

He had not been completely truthful or honest during his first grand jury appearance. After the Hattiesburg Airport drug bust, Ingram approached him about putting Judge Nixon in a good deal. Wiley Fairchild agreed to do so. Ingram asked Wiley to backdate the royalty conveyance documents. The promissory notes executed by Nixon were discussed and created only after the mineral royalty interests had been conveyed to Nixon. The $9500 price for the three investments was about one-third of their market value at the time of the transaction. After the deal was consummated, Ingram brought Nixon to Fairchild's office for a social visit. Nixon said to Fairchild: "If I can ever help you, I will. If I can't, I'll just tell you I can't." Sometime later, Royals made a blackmail demand to Fairchild on behalf of Porter. Because Wiley thought that Nixon owed him a favor for putting him in the three investments and because Wiley thought he could "deal" with Nixon, Wiley called Ingram and told him that he wanted to speak to Nixon. One afternoon soon thereafter, Ingram brought Nixon to Fairchild's office. Fairchild told Nixon that he thought he was being blackmailed by Porter, Royals, and Holmes regarding Drew's criminal case. Later that evening, Nixon telephoned Fairchild and (referring to Holmes) said: "You know the man that we was talking about this evening ... I'm out at his house.... Well, I talked to him and he said that everything is all right." Nixon then said: "He wants to talk to you." Holmes got on the telephone and said: "Wiley, when this man asks me to do something, I do it. I don't ask no questions." Sometime later, Drew's criminal case was "passed to the files."

(Wiley Fairchild, Nov. 28, 1984, Gr.J. Tr. at pp. 6–21, 24 & 29).

22) In January 1985, Ingram told the United States what he knew about Petitioner's visit to Wiley Fairchild's office and the

subsequent telephone call to Fairchild from Holmes' farm. (*See* Trial Transcript [hereinafter "Tr.Tr."] at pp. 1067–1070 & 1074–1080). In February 1985, Holmes testified before the Hattiesburg grand jury for a third time. During this appearance, Holmes admitted that there had been a telephone call.

23) Drew Fairchild's sentencing on his guilty plea in Forrest County Circuit Court was set for March 8, 1985. By letter dated March 5, 1985, Weingarten advised Glen L. White, the Forrest County District Attorney who replaced Holmes, that Drew Fairchild had cooperated in a federal grand jury investigation in Hattiesburg. (Pet. Exh. No. 4). Thereafter, White and Judge McKenzie announced that Drew Fairchild's plea agreement with Holmes would not be honored. On March 8, 1985, Drew withdrew his guilty plea. Shortly thereafter, Attorney Barry Hess, Drew's new attorney, determined that Drew was going to get an unfair and heavy sentence from Judge McKenzie. Hess telephoned Weingarten and asked Weingarten to indict Drew Fairchild federally. Hess proposed that Drew plead guilty and be sentenced in federal court. Hess anticipated using the federal plea and sentence as a bar to further proceedings in the state court.

24) On March 22, 1985, Weingarten and Jan Little, his assistant, recommended to their superiors that the United States indict Drew Fairchild. Among the reasons cited by Weingarten and Little were their opinions that:

(a) Drew Fairchild was being punished by White and McKenzie for his cooperation with the United States in the Hattiesburg grand jury investigation of Royals, Holmes, and Petitioner;

(b) White and McKenzie were friendly with and controlled by Holmes, making it unlikely that Drew would receive a fair state trial or sentence;

(c) for Drew to receive justice, he needed to be tried and sentenced in the impartial federal forum;

(d) the United States needed the cooperation of Drew and Wiley in its investi-

gations and prosecutions of Royals, Holmes, and Petitioner;

(e) failure to indict Drew federally could jeopardize those investigations and prosecutions.

(Pet. Exh. No. 5 at pp. 2–3). The Justice Department approved the federal prosecution of Drew Fairchild. On March 29, 1985, a federal grand jury indicted Drew for his role in the marijuana smuggling conspiracy. On that same day, Drew pled guilty to that federal indictment.

25) Also on March 29, 1985, the Hattiesburg grand jury indicted Holmes for obstruction of justice because Holmes had concealed from the grand jury the fact of the Holmes–Petitioner–Wiley Fairchild telephone call from Holmes' farm, and for four counts of perjury. In June 1985, Holmes and the United States entered into a plea agreement: Holmes agreed to plead guilty to a one-count information charging him with criminal contempt for concealing the telephone call; Holmes agreed to cooperate with the government; and the government agreed to dismiss the five charges contained in the indictment. Following his guilty plea, Holmes testified before the grand jury for a fourth time on June 28, 1985.

26) On July 11, 1985, a specially designated United States District Judge sentenced Drew Fairchild on the federal indictment to six months imprisonment to be followed by two and one-half years probation.

27) On August 29, 1985, the Hattiesburg grand jury returned its four-count indictment against Petitioner described in Section A above.

28) On September 18, 1985, a specially designated United States District Judge sentenced Wiley Fairchild, then age 73, on the gratuity charge to two years imprisonment with twenty-two months of it suspended. On December 11, 1985, the same District Judge sentenced Holmes on the one-count information to one year imprisonment plus a $10,000 fine.[4]

---

4. Holmes immediately paid the fine. After Peti- tioner's trial, the Fifth Circuit concluded that

29) By the time his trial took place in 1986, Petitioner had received over $60,000 in income alone from the mineral investments for which he had paid $9,500. As discussed in Section A above, on February 9, 1986, the jury returned verdicts of not guilty on Counts I and II and verdicts of guilty on Counts III and IV.

30) In June 1986, after a jury trial in the United States District Court for the Northern District of Alabama, Stocks and Lewis were acquitted of the perjury and obstruction of justice charges which had been brought against them in October 1985.

### C. *Trial Evidence Relating to Counts III and IV.*

On the direct appeal of Petitioner's conviction, the Court of Appeals stated, "It is undisputed that on one occasion, the exact date being unclear, [Petitioner] visited Wiley Fairchild in Fairchild's office." *United States v. Nixon,* 816 F.2d at 1025–1026. At Petitioner's trial, Wiley Fairchild and Petitioner disputed the content of their conversation in Fairchild's office. It is undisputed that, following this conversation, Petitioner and Holmes "went to Holmes' farm." *Id.* at 1026. However, at trial, Holmes and Petitioner disputed in whose car(s) they traveled and the content of their conversations enroute to the farm and at the farm. Finally, it is undisputed that a telephone call was placed from Holmes' farm to Wiley Fairchild and that both Holmes and Petitioner spoke to Fairchild during the telephone call. *Id.* at 1027–1029. However, at trial, Wiley Fairchild, Holmes, and Petitioner disputed who placed the telephone call and the content of the conversation between Fairchild and Petitioner during the telephone call. Petitioner's convictions on Counts III and IV are based upon the precise content of the disputed conversations which occurred at Fairchild's office, at Holmes' farm, and on the telephone. (Hereinafter, this sequence of events and conversations is referred to as the "disputed conversations.")

In all important respects, Wiley Fairchild, Holmes and Ingram testified at Petitioner's trial consistently with each other regarding the disputed conversations. (*See* Tr.Tr. at pp. 479–486, 517–519, 600–602, 614, 621, 639, 649–650, & 666 [Wiley Fairchild]; Tr.Tr. at pp. 736–740, 743–745, 749, 750, & 756–762 [Holmes]; and Tr.Tr. at pp. 1068–1070, 1074–1077, 1144, 1148, 1156, & 1168 [Ingram]). On the other hand, Petitioner's testimony in some instances confirmed and in other instances contradicted their version of what happened. (*See* Tr.Tr. at pp. 1512, 1513, 1515, 1524–1526, 1529–1545, 1559, 1560, 1572, 1574, 1597, 1598, 1670, 1672, 1677, & 1680 [Nixon]).

The trial testimony of Wiley Fairchild, Holmes, Ingram, and Petitioner reveals the following:

(1) The testimony of Petitioner and Wiley Fairchild concur that:

(a) Petitioner made a social visit to Fairchild in his office in early spring 1981 at which time Petitioner thanked Fairchild for the mineral royalty interest investments and said to Wiley: "If I can ever help you, I will and if I can't, I'll just tell you I can't."

(b) Sometime thereafter, Petitioner visited Wiley in his office at which time Wiley told Petitioner that he believed that he was being blackmailed by Holmes about Drew's criminal case, and that another person equally as involved as Drew had not been criminally prosecuted.

(c) During the evening of the same day as the second office visit, Wiley received a telephone call during which both Petitioner and Holmes spoke to Wiley from Holmes' farm.

(2) Petitioner and Wiley Fairchild contradicted each other with respect to:

(a) whether the disputed conversations occurred before or after Drew's criminal case was "passed to the files;"

(b) whether Wiley (through Ingram) summoned Petitioner for the second

---

the authorized punishment for the crime to which Holmes pled guilty was fine or imprisonment, but not both. Because Holmes had paid his fine, the Fifth Circuit held that Holmes had satisfied his sentence and, thus, that his sentence of one year imprisonment had to be vacated. *United States v. Holmes,* 822 F.2d 481 (5th Cir.1987).

office visit and how Petitioner got to Fairchild's office;

(c) whether Petitioner or Holmes placed the telephone call from the farm; and

(d) the content of the conversation between Wiley and Petitioner during this telephone call.

(3) Petitioner and Holmes testified in agreement that:

(a) They conversed and Petitioner told Holmes that Petitioner had talked to Wiley Fairchild earlier that day during which Wiley had mentioned Drew's criminal case to Petitioner.

(b) At Holmes' farm, Holmes served a "Royal Salute" scotch whiskey.

(c) After the drink, a telephone call was placed to Fairchild during which both Holmes and Petitioner spoke to Fairchild.

(4) Petitioner and Holmes contradicted each other with respect to:

(a) whether the disputed conversations occurred before or after Drew's criminal case was "passed to the files;"

(b) whether Petitioner went to Holmes' office before the two of them went to Holmes' farm;

(c) how they got to Holmes' farm;

(d) whether they had a conversation enroute to Holmes' farm;

(e) the content of their conversations either enroute to or at Holmes' farm; [5]

(f) who placed the telephone call to Fairchild from Holmes' farm;

(g) what Petitioner said to Fairchild during that telephone call; and

(h) whether Petitioner went with Holmes to a tavern after the visit to Holmes' farm.

(5) Wiley Fairchild and Holmes testified consistently:

(a) that the disputed conversations occurred before Drew's criminal case was "passed to the files;"

(b) that Petitioner placed the telephone call from Holmes' farm to Fairchild and spoke to Fairchild first; and

(c) regarding what Petitioner and Holmes each said to Fairchild during that telephone call.

Fairchild and Holmes did not contradict each other with respect to the disputed conversations.

(6) Ingram confirmed:

(a) Holmes' and Fairchild's dating of the disputed conversations; and

(b) Holmes' testimony regarding Holmes' and Ingram's conversations about the telephone call.

D. *Section 2255 Hearing Record and Credibility of Witnesses.*

At the evidentiary hearing, Wiley Fairchild attempted to recant portions of his trial testimony, of his second grand jury appearance testimony, and of his proffer of evidence to the United States, concerning relevant historical facts. Specifically, he attempted to recant his prior testimony that the disputed conversations occurred *before* Drew's criminal case was "passed to the files." Essentially, Wiley Fairchild testified during the § 2255 hearing that, with respect to the dating of the disputed conversations, he lied to the United States during his proffer in order to induce the United States to plea bargain with him and then perjured himself during his second grand jury appearance and at Petitioner's trial.

More specifically, Fairchild testified before this Court that: (1) His proffer statement was the truth to the best of his knowledge. (E.H.Tr. at p. 239). (2) At the time of Petitioner's trial, he believed and testified that the disputed conversations occurred *before* Drew's criminal case was "passed to the files." (E.H.Tr. at pp. 222–223). (3) Yet, after his brother Rodney Fairchild refreshed his memory, he remembered that the disputed conversations occurred *after* Drew's criminal case was "passed to the files." (E.H.Tr. at pp. 201–201 & 222). (4) His testimony at Petitioner's trial to the contrary (i.e., that the dis-

---

**5.** Petitioner testified that he told Holmes about Wiley Fairchild's blackmail charge against Holmes. Holmes testified that Petitioner told him that Fairchild wanted Petitioner to put in a good word with Holmes regarding Drew's criminal case.

puted conversations occurred *before* Drew's criminal case was "passed to the files") was not true and he knew it was not true when he so testified. (E.H.Tr. at pp. 214 & 216).

Wiley Fairchild also attempted to recant his trial and second grand jury appearance testimony regarding when Ingram approached him about putting Petitioner in an investment. At trial and during his second grand jury appearance, Fairchild testified that Ingram approached him after the drug bust. (Tr.Tr. at pp. 492–493; Wiley Fairchild, Nov. 28, 1984, Gr.J. Tr. at pp. 8–9). At the evidentiary hearing, Fairchild testified that Ingram approached him before the drug bust. (E.H.Tr. at pp. 195–196 & 216).

Wiley Fairchild did *not* attempt to recant his trial and second grand jury appearance testimony regarding the content of his conversation with Petitioner during the office visit, who telephoned him that evening, the content of his conversation with Holmes and Petitioner during the telephone call, or any other of his testimony concerning the historical facts of this case.

At the evidentiary hearing, Fairchild, Baltar, Hess, and representatives of the United States, including Weingarten, testified concerning interactions among themselves about Fairchild's proffer, statements to Fairchild and Baltar by Weingarten, and the conduct of Fairchild's pretrial witness preparation session. The testimony of Fairchild and Baltar on these matters directly and irreconcilably conflicted with the testimony of Hess, Weingarten, and the other representatives of the United States.

Baltar testified about his participation in preparing Fairchild to testify at Petitioner's trial and during Fairchild's second grand jury appearance. Baltar testified that, among other things, he knowingly prepared Fairchild to testify to matters which he knew that Fairchild did not remember or did not remember clearly. Baltar justified his conduct in this regard by stating that he was doing what his boss, Fairchild, wanted him to do and told him to do. He further justified his conduct by reasoning that, because he was not present during any of the factual events which formed the basis for Fairchild's substantive testimony, he could not know which of Fairchild's substantive testimony was the truth and which was not.

This Court finds Wiley Fairchild's testimony to be self-contradictory, puzzling and incredible! Whatever factors have combined to make him the rather pathetic figure he appeared to be on the witness stand is not for this Court to determine. Suffice it to say that, as a witness before this Court, his testimony was not worthy of belief.

John Baltar's testimony on key points was in lock-step with that of his former boss, Wiley Fairchild. On certain points, it is clearly contradicted by Baltar himself, other witnesses or documentary evidence. For example:

(1) Baltar's two affidavits differ regarding the date of discussions with Weingarten concerning a pardon for Wiley Fairchild. (*Compare* Pet.Exh. No. 13 ¶ 12 *with* Pet. Exh. No. 14 ¶ 16).

(2) Wiley Fairchild testified that he personally talked to Weingarten about a pardon and that Baltar was present during that discussion. Baltar testified that Fairchild never talked to Weingarten about a pardon. (*Compare* E.H.Tr. at pp. 209–210 & 225 [Fairchild] *with* E.H.Tr. at p. 108 [Baltar]).

(3) Barry Hess contradicted the testimony of Wiley Fairchild and Baltar regarding whether there was a promise by the government that it might dismiss the gratuity charge, whether Petitioner's Exhibit No. 17 is an accurate recording of Hess' conversation with Baltar concerning Weingarten's statement to Hess about dismissing the gratuity charge, and whether Weingarten promised to help Drew Fairchild. (*Compare* E.H.Tr. at pp. 250–251 & 277–279 [Hess] *with* E.H.Tr. at pp. 45–46 [Baltar]).

(4) Little and Weingarten contradicted Baltar regarding whether the government promised to help Drew Fairchild. (*Compare* E.H.Tr. at pp. 340 & 346–347 [Little]

*and* E.H.Tr. at pp. 389–390 [Weingarten] *with* E.H.Tr. at pp. 85–86 [Baltar]).

(5) Wiley Fairchild testified that Baltar influenced the substance of his trial testimony, while Baltar testified that he did not know whether the substance of Wiley's trial testimony was true. (*Compare* E.H.Tr. at pp. 213–214 [Fairchild] *with* E.H.Tr. at pp. 185–187 [Baltar]).

(6) Weingarten wholly contradicted Wiley Fairchild and Baltar regarding the genesis of Petitioner's Exhibit No. 1 and whether Weingarten ever saw it before Petitioner's trial. (*Compare* E.H.Tr. at pp. 395–397 & 458–463 [Weingarten] *with* E.H.Tr. at pp. 211–216 & 231–237 [Fairchild] *and* E.H.Tr. at pp. 64–71, 79–85, 107–110, 164–178, 185, & 186 [Baltar]).

(7) Baltar's testimony regarding plea negotiations with the government before Wiley Fairchild's proffer was refuted by Agent Kennedy and the documentary evidence. (*Compare* E.H.Tr. at pp. 28–36 [Baltar] *with* E.H.Tr. at pp. 488–496 [Kennedy] *and* Gov't Exhs. S & T).

(8) Baltar initially denied any friendship with Petitioner, but later admitted that he was a friend of Petitioner. (*See* E.H.Tr. at pp. 76–79 [Baltar]).

These instances are not exhaustive, but are examples of the contradictions which pervaded Baltar's testimony.

This Court believes John Baltar's testimony was not trustworthy or credible. Neither Wiley Fairchild nor John Baltar, by manner or appearance on the witness stand, indicated any innate understanding of truthfulness. Petitioner in his post-hearing brief finds no apparent motive for the testimony of Wiley Fairchild and Baltar "beyond a simple regard for the truth." (Pet. Post–H. Br. at p. 9). Obviously, the Court rejects this argument.

The Court credits the testimony of the following witnesses generally and also specifically in the areas indicated where contradicted by Wiley Fairchild or John Baltar, or both:

(1) Attorney Barry Hess (a pardon, a government promise to drop the gratuity charge, government statements or promises about the Drew Fairchild matter).

(2) Attorney Reid Weingarten (dealings with and statements to Wiley Fairchild and John Baltar).

(3) Attorney H. Marshall Jarrett (the proffer).

(4) Agent Donald Lawless (pre-trial preparation session).

(5) Agent Weldon Kennedy (contacts by Ed Pittman and John Baltar; the proffer).

(6) Agent Kenneth White–Spunner, Jr. (the teletype).

(7) Attorney Jan Little (dealings with and statements to Wiley Fairchild and John Baltar).

This is not to say, of course, that every word uttered by these seven witnesses was perfectly remembered and precisely stated and that all utterances of Wiley Fairchild and John Baltar were false. Few witnesses recall the details of events perfectly and minor discrepancies do occur. On the other hand, at least in this case, certain basic truths emerged. This Court is convinced that the explanations given by the government's witnesses concerning certain key matters (i.e., the pardon, promises made regarding Drew Fairchild and Wiley Fairchild, the three purported Jencks Act documents, Weingarten's dealings with Wiley Fairchild, etc.) were sensible, understandable and believable under all the circumstances.

E. *Grounds 1 and 2: Failure to Disclose Favorable Evidence and Knowing Use of False Testimony.*

1. Petitioner's Allegations.

Petitioner alleges as his first ground for relief that the government failed to disclose to him certain favorable evidence in violation of the Due Process Clause and the trial court's discovery order. *See Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Specifically, Petitioner argues that the government failed to disclose to him four promises and inducements which it had made to witnesses Wiley and Drew Fairchild in return for Wi-

ley's guilty plea and cooperation with the government, and it failed to disclose to him certain documents containing evidence impeaching Wiley.

The four undisclosed promises or inducements which were allegedly made by the government to the Fairchilds are:

(1) a promise to Wiley that Weingarten would help him obtain a pardon after Petitioner's trial;

(2) a promise to Wiley that federal prosecutors would do what they could to help Drew Fairchild with his drug charges;

(3) a promise to Drew that federal prosecutors would not make a sentencing recommendation at his sentencing; and

(4) a promise to Wiley that federal prosecutors might dismiss the gratuity charge to which Wiley had pled guilty.

Petitioner also argues that two documents were not disclosed to him which allegedly contained evidence impeaching Wiley Fairchild: (1) statements attributed to Wiley contained in an internal FBI teletype (Pet. Exh. No. 20), and (2) statements in the government's prosecution memorandum regarding Drew Fairchild (Pet. Exh. No. 5). Petitioner contends that the teletype contained prior inconsistent statements of Wiley Fairchild and that the prosecution memorandum stated that the federal indictment of Drew was intended to induce Wiley Fairchild to cooperate with the government.

As his original second ground for relief, Petitioner charges that the government knowingly used false testimony to obtain his conviction by allowing the Fairchilds to testify in a false, incomplete and misleading manner concerning:

(1) whether the four undisclosed promises and inducements alleged as the basis for Petitioner's first ground for relief had been made; and

(2) the mutual cooperation that occurred between Wiley and the government.

Petitioner contends that the government's alleged failure to disclose favorable evidence and its alleged knowing use of the Fairchilds' false testimony prevented him from being able to impeach Wiley fully at trial. Wiley's credibility, Petitioner argues, was determinative of Petitioner's guilt or innocence on Counts III and IV because Wiley's testimony corroborated Holmes' and Ingram's testimony and contradicted Petitioner's testimony on critical historical facts.

2. Motion to Amend.

As noted in Section A above, Petitioner moved to amend his original second ground for relief to add the allegation that the government knowingly used false testimony to obtain his conviction, by allowing Wiley Fairchild to testify falsely at Petitioner's trial about:

(1) whether Ingram approached Wiley about an investment for Petitioner before or after the drug bust in 1980;

(2) whether Petitioner paid a fair market value price for the mineral investments which he obtained from Wiley;

(3) whether the disputed conversations occurred before or after Drew's criminal case was "passed to the files;" and

(4) who placed the telephone call to Wiley from Holmes' farm.

Petitioner contends that the government's knowing use of Wiley Fairchild's false testimony on these historical facts was material to his convictions because Wiley corroborated Holmes' testimony and some of Ingram's testimony and contradicted Petitioner's testimony and other parts of Ingram's testimony.

Petitioner argues that he should be allowed to amend his second ground for relief because his evidence in support of the additional allegations is the same as that offered in support of his first and unamended second grounds for relief. In view of the serious nature of Petitioner's allegation that the government knowingly used false testimony at his trial, and because the § 2255 hearing evidence offered by both parties related to this issue, the Court will allow Petitioner to amend his second ground for relief. The Court, there-

fore, will consider the added charge on its merits.

### 3. Failure to Disclose Favorable Evidence—Legal Standards.

In *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or punishment." 373 U.S. at 87, 83 S.Ct. at 1196.

> When the credibility of a [prosecution] witness is a critical issue in a criminal case and proof of any understanding or agreement [between the witness and the prosecution] is relevant to a witness' credibility, the defendant has a right to bring this to the jury's attention.... To deny the defendant the opportunity to present to the jury any promises, agreements, and understanding between the [prosecution] and a key prosecution witness deprives the defendant of due process of law.

*Joyner v. King,* 786 F.2d 1317, 1319 (5th Cir.), *cert. denied,* 479 U.S. 1010, 107 S.Ct. 653, 93 L.Ed.2d 708 (1986), *citing Giglio v. United States,* 405 U.S. 150, 154–155, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). Thus, the *Brady* disclosure rule applies both to direct exculpatory evidence and to evidence impeaching the prosecution's witnesses. *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985); *Porretto v. Stalder,* 834 F.2d 461, 464 (5th Cir.1987); *United States v. McKenzie,* 768 F.2d 602, 610 (5th Cir.1985), *cert. denied,* 474 U.S. 1086, 106 S.Ct. 861, 88 L.Ed.2d 900 (1986).

The *Brady* disclosure rule requires the prosecution timely to disclose to the defendant all impeachment evidence "which impeaches the testimony of a [prosecution] witness where the reliability of the witness may be determinative of guilt or innocence." *Porretto,* 834 F.2d at 464. Such evidence includes all plea, sentencing, coop-

eration, immunity, fee and other agreements, all promises, inducements and understandings, and all criminal records. *Giglio,* 405 U.S. at 154–155, 92 S.Ct. at 766; *United States v. Newman,* 849 F.2d 156, 161 (5th Cir.1988); *Porretto,* 834 F.2d at 464; *United States v. Cervantes–Pacheco,* 826 F.2d 310, 315–316 (5th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 749, 98 L.Ed.2d 762 (1988); *Joyner,* 786 F.2d at 1319; *United States v. Franklin Eugene Nixon,* 634 F.2d 306, 312 (5th Cir.), *cert. denied,* 454 U.S. 828, 102 S.Ct. 120, 70 L.Ed.2d 103 (1981); *United States v. Anderson,* 574 F.2d 1347, 1354 (5th Cir. 1978).

In order to establish a violation of the *Brady* disclosure rule, the Petitioner must prove that: (1) the prosecution failed to disclose evidence, (2) which was favorable to him, and (3) which was material to the defense. *United States v. Lanford,* 838 F.2d 1351, 1355 (5th Cir.1988); *United States v. Lassiter,* 819 F.2d 84, 86 (5th Cir.1987). The third of these elements is critical. The prosecution's failure to disclose favorable evidence to Petitioner violates due process and requires setting aside the Petitioner's conviction, only if the favorable evidence was "material." *Bagley,* 473 U.S. at 669, 674–676 & 678–682, 105 S.Ct. at 3376, 3379–3380, 3381–3383; *Lanford,* 838 F.2d at 1355; *Lassiter,* 819 F.2d at 86. In *United States v. Bagley,* the Supreme Court defined the materiality standard for undisclosed evidence as follows:

> The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

*Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383; [6] *see Barnes v. Lynaugh,* 817 F.2d 336, 339 (5th Cir.1987); *United States v. McKellar,*

---

**6.** The Supreme Court derived this materiality standard from *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984),

and *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

798 F.2d 151, 153 (5th Cir.1986).[7]

### 4. Knowing Use of False Testimony—Legal Standards.

■ Due process requirements of fundamental fairness prevent the prosecution from obtaining a defendant's conviction through the knowing use of material false testimony. *Bagley*, 473 U.S. at 679, 105 S.Ct. at 3382; *Agurs*, 427 U.S. at 103, 96 S.Ct. at 2397; *Giglio*, 405 U.S. at 154, 92 S.Ct. at 766; *Napue v. Illinois*, 360 U.S. 264, 271, 79 S.Ct. 1173, 1178, 3 L.Ed.2d 1217 (1959); *Mooney v. Holohan*, 294 U.S. 103, 112, 55 S.Ct. 340, 341, 79 L.Ed. 791 (1935); *Valles v. Lynaugh*, 835 F.2d 126 (5th Cir.1988); *United States v. Ramirez–Preciado*, 747 F.2d 273 (5th Cir.1984); *United States v. Antone*, 603 F.2d 566 (5th Cir.1979). " 'The same rule applies if the prosecution, although not actively soliciting false testimony, passively but knowingly allows it to go uncorrected or allows it to be presented with a materially false impression'." *United States v. Brown*, 634 F.2d 819, 827 (5th Cir.1981), *quoting United States v. Anderson*, 574 F.2d 1347, 1355 (5th Cir.1978). Further, "[t]he same result obtains even though the false nature of the evidence concerns only the credibility of an important witness, rather than the ultimate issue of guilt or innocence." *Brown*, 634 F.2d at 827.

To prevail on a claim that the prosecution obtained his conviction through the knowing use of false testimony, Petitioner must prove that: (1) the testimony was actually false, (2) the false testimony was material, and (3) the prosecution knew or reasonably should have known that the testimony was false. *United States v. Chagra*, 735 F.2d 870, 874 (5th Cir.1984); *Shaw v. Estelle*, 686 F.2d 273, 275 (5th Cir.1982), *cert. denied*, 459 U.S. 1215, 103 S.Ct. 1215, 75

L.Ed.2d 453 (1983); *Griffith v. United States*, 535 F.2d 320, 321 (5th Cir.1976). The materiality standard for false testimony is not significantly different from the *United States v. Bagley* materiality standard for violations of the *Brady* disclosure rule. *See Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383. False testimony is material, and Petitioner's conviction must be set aside, "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Agurs*, 427 U.S. at 103, 96 S.Ct. at 2397; *Napue*, 360 U.S. at 271, 79 S.Ct. at 1178; *see Bagley*, 473 U.S. at 678–679 & 679 nn. 9–10, 105 S.Ct. at 3381–3382 & 3382 nn. 9–10.

### 5. Promises and Inducements to Witnesses.

For the reasons set forth above, the Court does not credit the testimony of Wiley Fairchild and John Baltar regarding the existence of undisclosed promises and inducements by the government to Wiley and Drew Fairchild.

#### (1) *The pardon.*

■ This Court finds that the government did not promise Wiley Fairchild that it would help him obtain a pardon after Petitioner's trial. Rather, prosecutor Weingarten merely explained the pardon procedure and explained that, as a part of that procedure, he (as the prosecutor) would normally be asked to describe Wiley's cooperation with the United States. (E.H.Tr. at pp. 380–381). There is no credible evidence that Weingarten's statements regarding a pardon came close to constituting a promise or inducement to Wiley. These statements did not constitute *Brady* material.

---

**7.** The *United States v. Bagley* materiality standard for undisclosed favorable evidence applies to direct exculpatory evidence and to impeachment evidence, and applies whether the defendant made no request, a general request or a specific request for *Brady* materials. *Bagley*, 473 U.S. at 676–678 & 682, 105 S.Ct. at 3380–3381 & 3383. Yet, in applying this materiality standard, the reviewing court should consider whether the prosecution's failure to disclose the evidence misled the defense and thus adversely

affected "the preparation or presentation of the defendant's case." *Id.* at 682–683, 105 S.Ct. at 3383–3384; *McKellar*, 798 F.2d at 153. Further, the reviewing court should consider the totality of the circumstances of the case with an awareness of the difficulty of determining what the defense would have done had the defense not been misled by the prosecutor's failure to disclose the evidence. *Bagley*, 473 U.S. at 683, 105 S.Ct. at 3384.

# 558

## (2) *Help for Drew.*

■ The government did not promise Wiley Fairchild, as a part of his plea agreement, that it would do what it could to help Drew in dealing with the drug charges against him. (E.H.Tr. at pp. 285–286, 340, 346–347, & 389–390). In March 1985 (after Wiley's guilty plea and second grand jury appearance), when Hess (acting as Drew Fairchild's attorney) asked Weingarten to indict Drew federally, Weingarten told Hess that he would do what he could to ensure that Drew was not punished for his cooperation with the United States. (E.H.Tr. at pp. 423–428). Weingarten did not intend this statement to Hess to be a promise or inducement to Wiley Fairchild or to Drew Fairchild. Nor was it so construed by Barry Hess! This statement by Weingarten to Hess did not constitute *Brady* material.

In fact, before his trial, Petitioner was fully advised about Wiley's plea agreement and about the circumstances leading to Drew's federal indictment. (*See* Pet.Exh. No. 7). By the time of his trial, Petitioner knew that Drew had been indicted and sentenced. (*See* Section B, ¶¶ 24 & 26 above). Thus, even if Petitioner had known of Weingarten's statement to Hess, the statement would have provided only minimal added impeachment evidence against Wiley Fairchild. Therefore, the Court further concludes that the statement was not material to Petitioner's defense since there is no reasonable probability that the result of Petitioner's trial would have been different if the statement had been disclosed.

## (3) *Sentencing recommendation.*

■ Weingarten did orally tell attorney Hess that he would not make a sentencing recommendation for Drew Fairchild at his sentencing. (E.H.Tr. at pp. 269–270, 287–288, & 440). There is no indication in the record that Drew or Wiley was informed of or knew about this statement. In this Court's experience (except in unusual circumstances not present here), such a statement to an attorney has little significance and does not rise to the level of a promise for *Brady* purposes. Even though both Hess and Weingarten described this statement as a promise, this Court does not believe that this statement was a true plea bargain promise. It was not made to induce any action by Drew or Wiley.

■ For purposes of argument only, the Court will treat this assurance as a *Brady* promise. In doing so, several facts must be considered. Drew was sentenced before Petitioner's trial (and thus before Drew's and Wiley's testimony). Drew's testimony did not pertain to Counts III and IV. The Court, therefore, concludes that the added impeachment of Drew or Wiley which knowledge of the statement would have provided was not material to Petitioner's defense on Counts III and IV. There is no reasonable probability that the result of the trial would have been different had the statement been known. Thus, the government's failure to disclose to Petitioner the oral assurance to Hess regarding Drew did not deny Petitioner due process and does not warrant or require setting aside his convictions.

## (4) *Dismissal of gratuity charge.*

■ The government did not promise Wiley Fairchild, as a part of his plea agreement, that it might dismiss the gratuity charge to which he had pled guilty. Rather, Weingarten told Hess that the government would dismiss the gratuity charge only if the government concluded that Wiley had not committed the gratuity crime. Weingarten also pointed out that in light of Wiley's admission to facts establishing his guilt on the gratuity crime during his second grand jury appearance, the possibility of such dismissal was remote. (E.H.Tr. at pp. 249–251, 276–278, & 377–378). This statement to Hess was not a part of Wiley's plea agreement and clearly was not a promise or inducement to Wiley. Petitioner's contention on this point borders on the ridiculous. In fact, the government has a continuing duty to dismiss a case against any defendant who it determines is not guilty. The statement did not constitute *Brady* material. Even if Wiley and Baltar misinterpreted Weingarten's statement to Hess as an inducement (which seems most unlikely), such misinterpretation was not

reasonable and did not convert that statement into *Brady* material.

### 6. Undisclosed Documents.

Petitioner contends that certain government documents, Petitioner's Exhibit Nos. 20 and 5, constituted *Brady* material, because they contained information impeaching Wiley Fairchild's trial testimony. The government did not disclose either document to Petitioner.

Exhibit No. 20 is a November 2, 1984, internal FBI teletype communication sent from the Jackson FBI office to FBI Headquarters. FBI Agent Kenneth White–Spunner, Jr., prepared the teletype on the day following Wiley Fairchild's proffer to the United States. In the teletype, Agent White–Spunner attempted to summarize Mississippi Attorney General Ed Pittman's and Baltar's contacts with Agent Kennedy, Wiley's proffer on November 1, 1984 and a contact by Baltar with the United States on November 2, 1984. (*See* Gov't Exh. S & T; Section B ¶¶ 18–20 above). The teletype contains three items of information which Petitioner contends are favorable and material to his case, i.e., (1) that Baltar told Kennedy that Wiley wanted immunity in exchange for his cooperation, (2) that Wiley stated at his proffer that the telephone call to Wiley from Holmes' farm occurred in December 1982, and (3) that Wiley stated at his proffer that Holmes placed the telephone call.

Petitioner's arguments are without merit. An FBI internal teletype, such as Exhibit No. 20, is intended to quickly advise FBI Headquarters in very summary fashion about an investigation. An agent usually prepares the teletype by summarizing available investigative information. Although the internal teletype is intended to be as accurate as possible, it is often based upon second-hand knowledge.

■ The first item of information in the teletype, i.e., the fact that Baltar told Kennedy that Wiley wanted immunity in exchange for cooperation, was not a part of

Wiley's plea agreement and was not a promise or inducement to Wiley. Rather, it was merely a request by Wiley during the plea negotiations. Absolute immunity was never agreed to by the government. Therefore, the information did not constitute *Brady* material. The government was under no obligation to disclose the teletype merely because it indicated that Wiley wanted immunity in exchange for cooperation.

■ The statements attributed to Wiley in the second and third items of information were not made by Wiley in his proffer, although Agent White–Spunner erroneously attributed them to Wiley's proffer. Agent White–Spunner was not present at Wiley Fairchild's proffer. His teletype summary is based upon two FBI Form 302s (Gov't Exhs. S & T) and second-hand information provided to White–Spunner by Weingarten, Jarrett and Kennedy. Weingarten, Jarrett and Kennedy did not tell White–Spunner that Wiley Fairchild stated in his proffer that the telephone call occurred in December 1982 and that Holmes placed it, but White–Spunner nevertheless erroneously included these two items in his summary of the proffer. The statement in the teletype that Holmes placed the telephone call was taken from the two FBI Form 302s, which White–Spunner also summarized, but which were not statements of Wiley Fairchild. (E.H.Tr. at pp. 510–517). The origin of the statement in the teletype that the telephone call occurred in December 1982 is not clear. However, Wiley Fairchild did not state this in his proffer. Therefore, Exhibit No. 20 does not contain reliable evidence favorable to Petitioner and it did not constitute *Brady* material.[8]

■ Exhibit No. 5 is the government's internal prosecution memorandum regarding Drew Fairchild. It was ordered disclosed to Petitioner by this Court prior to the § 2255 hearing. It contains Weingarten's and Little's considerations of factors for and against prosecuting Drew Fairchild

---

**8.** The Court also rejects Baltar's and Wiley's testimony that Wiley made material statements at the proffer and during the interview before

the proffer which were not included in the proffer transcript.

in federal court. It is not evidence that the prosecution of Drew was part of an agreement between the government and Wiley Fairchild. Petitioner misconstrues Exhibit No. 5 to say that the government prosecuted Drew federally in order to induce Wiley to cooperate with the United States.

 Exhibit No. 5 does not contain evidence favorable to Petitioner and it did not constitute *Brady* material. It was the work-product of government attorneys which was exempt from discovery at his trial. *See* Fed.R.Crim.P. 16(a)(2). Furthermore, Drew was indicted and sentenced in federal court before Petitioner's trial. This was known by Petitioner before trial. Accordingly, even if Exhibit No. 5 had been available to Petitioner at trial, there is no reasonable probability that this would have altered the result of the trial.

7. False Testimony.

Petitioner alleges that Wiley Fairchild and Drew Fairchild testified falsely at trial about the four government promises and inducements which are described in Section E.1, above. This Court has found above that no such promises or inducements were made. Therefore, their testimony on these matters was not false.

Based upon Wiley Fairchild's attempted recantation of portions of his trial testimony during the § 2255 hearing, Petitioner argues that Wiley testified falsely at Petitioner's trial about four additional matters: (1) the date of the Ingram approach to Wiley Fairchild, (2) whether Petitioner paid a fair market value price for the mineral investments, (3) the date of the disputed conversations, and (4) who placed the telephone call.

 With respect to factual issue (1), the date of Ingram's approach to Wiley has doubtful relevance to whether Petitioner committed the acts of perjury charged in Counts III and IV. That the approach occurred in 1979 does not establish that the investments were made before the drug bust. That the approach occurred in 1979 does not in any way affect the content of the disputed conversations. That the approach occurred in 1979 does not materially impeach Wiley Fairchild with respect to the content of the disputed conversations. The Court, therefore, concludes that there is no reasonable likelihood that Wiley's trial testimony regarding the date of the Ingram approach, even if deemed false, could have affected the judgment of the jury.

Moreover, even assuming that Ingram approached Wiley about an investment for Petitioner in 1979,[9] and that Wiley's trial testimony that this occurred after the drug bust was false, Petitioner has failed to establish that the government knew that Wiley's trial testimony on this issue was false.

Wiley Fairchild did *not* testify at the evidentiary hearing that his trial testimony with respect to factual issues (2) and (4) was false. Wiley's testimony before Congress is insufficient to demonstrate in this proceeding that his trial testimony on those two issues was false. Moreover, even if Wiley's trial testimony on those two issues was false, Petitioner has not demonstrated that the government knew it was false. Thus, Petitioner has not demonstrated that the government knowingly used false testimony on factual issues (2) or (4) to obtain Petitioner's conviction.

For the reasons set forth in Section D above, the Court rejects Wiley Fairchild's attempted recantation with respect to factual issue (3). Petitioner has not established that Wiley's trial testimony on this issue was false. Thus, Petitioner has not demonstrated that the government knowingly used false testimony on this issue to obtain his convictions.[10]

9. Both Petitioner and Ingram testified that Ingram approached Fairchild before the Hattiesburg Airport drug bust. (Tr.Tr. at pp. 1476–77, 1479 & 1482–1484 [Nixon] and at pp. 1026–1031 [Ingram] ).

10. The parties have devoted considerable attention to whether the government's alleged failure to disclose favorable evidence and alleged knowing use of false testimony were material to Petitioner's convictions on Counts III and IV. The Court declines to reach this materiality question where the Court finds that the government did not fail to disclose favorable evidence or did not knowingly use false trial testimony.

Therefore, Petitioner's first and second grounds for relief are without merit.[11]

## F. Ground 3: Jencks Act Violations.

### 1. Petitioner's Allegations.

As his third ground for relief Petitioner alleges that the government failed to disclose three documents in violation of the Due Process Clause, the Jencks Act (18 U.S.C. § 3500) and the trial court's discovery order regarding Jencks Act materials. Petitioner contends these documents are pretrial statements of witness Wiley Fairchild which would have materially aided him in his cross-examination of Fairchild.

Petitioner timely filed a pre-trial motion for production of all Jencks Act materials. The government responded by agreeing to produce one week before trial all Jencks Act materials for any witnesses whom it planned to call at trial. The trial court accepted the government's agreement as its ruling on Petitioner's motion. (Pet. Exh. No. 6). It is undisputed that the government did not produce the three documents which are the subject of Petitioner's third ground for relief.

The government argues that claims alleging violations of the Jencks Act and of related discovery orders are not cognizable under § 2255 and that this ground for relief is factually without merit. The government asserts that it fully complied with its disclosure obligations.

### 2. Jencks Act—Legal Standards.

The Fifth Circuit has not explicitly ruled whether claims of failure to produce Jencks Act materials are cognizable grounds for relief under § 2255. Cf. Williams v. United States, 488 F.2d 963, 964 (5th Cir.1974). This Court will assume that in the Fifth Circuit claims of failure to produce Jencks

Act materials are cognizable under § 2255. Cf. United States v. Addonizio, 442 U.S. 178, 185, 99 S.Ct. 2235, 2240, 60 L.Ed.2d 805 (1979); Strand v. United States, 780 F.2d 1497, 1499–1501 (10th Cir.1985); Krilich v. United States, 502 F.2d 680, 686 (7th Cir.1974), cert. denied, 420 U.S. 992, 95 S.Ct. 1429, 43 L.Ed.2d 673 (1975).

Congress enacted the Jencks Act, 18 U.S.C. § 3500, in 1957 to codify the rule established by Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957). See Palermo v. United States, 360 U.S. 343, 346, 79 S.Ct. 1217, 1221, 3 L.Ed.2d 1287 (1959). The Jencks Act requires, upon the defendant's motion, that the government produce to the defendant: (1) any written or recorded statement of a United States witness (2) that is in the possession of the prosecution and (3) that (i) has been signed or otherwise adopted or approved by the witness, or (ii) is a substantially verbatim recital of the witness' oral statements, or (iii) is the witness' grand jury testimony. Goldberg v. United States, 425 U.S. 94, 103, 96 S.Ct. 1338, 1344, 47 L.Ed.2d 603 (1976); United States v. Newman, 849 F.2d 156, 160 (5th Cir.1988); United States v. Welch, 810 F.2d 485, 490 (5th Cir.), appeal after remand, 817 F.2d 273 (5th Cir.), cert. denied, —— U.S. ——, 108 S.Ct. 350, 98 L.Ed.2d 376 (1987); United States v. Trevino, 556 F.2d 1265, 1271 (5th Cir.1977). The burden of showing entitlement to production is on the defendant. United States v. Merida, 765 F.2d 1205, 1216 (5th Cir. 1985).

Written documents prepared by government agents and witness interview notes taken by government agents, including government attorneys' notes taken during pretrial witness preparation sessions, are Jencks Act materials, if the witness has signed or otherwise adopted or approved the documents or if the documents are a

---

11. Petitioner requests that the Court treat his § 2255 motion to vacate as a motion for new trial based upon newly discovered evidence. See Mitchell v. United States, 368 U.S. 439, 82 S.Ct. 462, 7 L.Ed.2d 429 (1962) (per curiam). So treated, Petitioner's request for a new trial is denied because his newly discovered evidence (the alleged undisclosed promises and induce-

ments, the undisclosed government documents, and Wiley Fairchild's attempted recantation) is either not material to Petitioner's convictions on Counts III and IV or is not such that a new trial would probably result in an acquital. United States v. Adi, 759 F.2d 404, 407 (5th Cir.1985); United States v. Bi–Co Pavers, Inc., 741 F.2d 730, 736 (5th Cir.1984).

contemporaneously made, substantially verbatim recital of the witness' oral statements. *Goldberg v. United States*, 425 U.S. at 101–108, 96 S.Ct. at 1343–1347; *id.* at 114, 96 S.Ct. at 1350 (Stevens, J., concurring); *Campbell v. United States*, 373 U.S. 487, 497, 83 S.Ct. 1356–1362, 10 L.Ed.2d 501 (1963); *United States v. Newman*, 849 F.2d at 160; *United States v. Hodges*, 556 F.2d 366, 368 (5th Cir.1977), *cert. denied*, 434 U.S. 1016, 98 S.Ct. 735, 54 L.Ed.2d 762 (1978); *cf. United States v. Welch*, 810 F.2d at 490. However, the government interviewer is not required to conduct the witness interview or to take interview notes in a fashion that creates Jencks Act materials. *United States v. Martino*, 648 F.2d 367, 387 (5th Cir.), *reconsidered in part*, 650 F.2d 651 (5th Cir.1981) (vacating judgment against one defendant on other grounds), *cert. denied*, 456 U.S. 943, 102 S.Ct. 2006, 72 L.Ed.2d 465 (1982).

▆▆▆▆ Interview notes which are not a substantially verbatim transcription of the interview are not a Jencks Act statement of the witness interviewed, unless it is shown that the witness specifically adopted or approved them. *United States v. Gates*, 557 F.2d 1086, 1089 (5th Cir.1977), *cert. denied*, 434 U.S. 1017, 98 S.Ct. 737, 54 L.Ed.2d 763 (1978). The witness' general approval of the substance of the notes is not sufficient to constitute adoption or approval. *United States v. Judon*, 567 F.2d 1289, 1292 (5th Cir.1978). Moreover, a mere verbal exchange between the interviewer and the witness over the substance of the witness' testimony, with the interviewer relying upon his notes, does not effect an adoption or approval of the notes by the witness. *Goldberg v. United States*, 425 U.S. at 110 n. 19, 96 S.Ct. at 1348 n. 19; *United States v. Newman*, 849 F.2d at 160. Similarly, the interviewer rereading portions of his notes back to the witness to ensure accuracy does not constitute adoption or approval. *United States v. Hogan*, 763 F.2d 697, 704 (5th Cir.), *opinion withdrawn in part*, 771 F.2d 82

(5th Cir.1985), *appeal after remand*, 779 F.2d 296 (5th Cir.1986).

With these precepts in mind, the Court will consider the three documents identified by Petitioner and claimed to be Jencks Act statements of witness Wiley Fairchild.[12]

### 3. Prosecutor's Outline.

▆▆▆▆ The first document, Petitioner's Exhibit Nos. 22 and 22A, penned by Reid Weingarten, is a two-page handwritten rough outline (consisting of approximately 65 words) of Wiley Fairchild's possible testimony. Petitioner's § 2255 attorneys represented that, at some point prior to the § 2255 evidentiary hearing, the original of this document was discovered in the files of Fairchild Construction Company. (E.H.Tr. at p. 433). Neither Wiley Fairchild nor John Baltar testified about the circumstances of their receipt and retention of this document nor about their use of it. Weingarten testified that he must have given it to one of them, but he did not recall the circumstances, except that he could have given it to either Fairchild or Baltar before Fairchild's second grand jury appearance or before Fairchild's trial testimony. (E.H.Tr. at pp. 433–434).

On its face, Weingarten's outline is not a written statement by Wiley Fairchild setting forth his testimony. Rather, it is a rough outline of some of the possible points of Fairchild's testimony. Even if Weingarten had given it to Fairchild to use in preparing for his testimony or in preparing other documents, no evidence established that Fairchild read it, signed it, or adopted it in any fashion before trial. No evidence established that it was a verbatim record of an oral statement of Fairchild. Finally, although prepared by Weingarten, there is no evidence that it was in the possession of the United States government when Petitioner's pre-trial motion for disclosure was filed or thereafter.

### 4. Baltar's Chronology.

▆▆▆▆ The second document, Petitioner's Exhibit No. 18, penned by John Baltar, is a

---

**12.** As the following discussion indicates, none of these documents was "in the possession of the United States" so as to render them discoverable under the Jencks Act.

four-page handwritten chronology of key events. Baltar testified that he prepared it at Weingarten's direction before Fairchild's second grand jury appearance. Baltar derived it in part from another document (Pet. Exh. No. 19), which he had prepared after going through attorney Gunn's files. Baltar testified that he obtained some of the factual information in it from Weingarten and that Weingarten told him that Wiley Fairchild had to get certain important facts right in his second grand jury appearance. Baltar testified that he then included those important facts in this document even though Fairchild did not clearly remember those facts. Finally, Baltar testified that Wiley Fairchild studied this document in preparing for his second grand jury appearance. (E.H.Tr. at pp. 51–54, & 158–160). From these facts, the Court concludes that this document was a written statement of witness Wiley Fairchild. Wiley Fairchild adopted or approved it after Baltar prepared it for him. Fairchild studied or used it in preparing for his second grand jury appearance.

Weingarten testified that he suggested that Baltar and Fairchild prepare Fairchild for the second grand jury appearance and that they should prepare a writing containing the important facts that Wiley Fairchild would testify to. Weingarten testified that he advised Baltar to write down the relevant facts and events and to discuss them in the context of when they happened, but that he did *not:* give Baltar factual information for this purpose, tell Baltar that Fairchild had to testify to certain specific facts and had to get those facts right, or tell Baltar to include those facts in the document. Weingarten merely advised Baltar to write down the relevant, truthful facts of which Wiley Fairchild had personal knowledge. Finally, Weingarten testified that he reviewed the document with Baltar and Fairchild prior to Fairchild's second grand jury appearance. (E.H.Tr. at pp. 374, 377, 395, & 431–436).

The Court finds that Weingarten merely suggested that Baltar prepare the document and include in it the relevant, truthful facts of which Fairchild had personal knowledge. Weingarten did not give Baltar factual information and did not direct Baltar that Fairchild had to testify to certain specific facts. The government had no role in determining the contents of the document. The mere fact that Weingarten saw it when he reviewed its contents with Baltar does not establish government possession of it. It is not Jencks Act material.

5. Baltar's Notes.

■ The third document, Petitioner's Exhibit No. 1, is a three-page typed outline of Fairchild's testimony, in question and answer form. The genesis of this document, and the conducting of a related pretrial witness interview session for Wiley Fairchild, are in dispute. (*See* E.H.Tr. at pp. 64–71, 79–85, 107–110, 164–178, & 185–186 [Baltar]; E.H.Tr. at pp. 211–213, 214–216, & 231–237 [Wiley Fairchild]; E.H.Tr. at pp. 395–397, & 458–463 [Weingarten]; and E.H.Tr. at pp. 522–524 [Lawless]).

The Court finds that a few days before Wiley Fairchild was to testify at Petitioner's trial, Weingarten interviewed Fairchild in Fairchild's office. Such pretrial witness interviews are commonplace and are a proper method of trial preparation. Also present, at this interview were FBI Agent Lawless, who had driven Weingarten to the interview and Baltar. During the interview, Weingarten asked Fairchild questions he expected to use at trial. In doing this, Weingarten read from a list of questions he had prepared. Weingarten did not ever show his question list or his notes to Baltar or Fairchild. During the interview, Baltar took his own notes of Weingarten's questions and Fairchild's answers. Petitioner's Exhibit No. 1 is a typed copy of Baltar's notes. Weingarten never saw Baltar's notes or Exhibit No. 1 before this § 2255 proceeding.

Petitioner has not established that Wiley Fairchild adopted or approved any pretrial witness interview notes or any other documents in Weingarten's possession. Petitioner has not established that Baltar's notes or Exhibit No. 1 were ever in Weingarten's possession, that Baltar's notes or Exhibit No. 1 were derived from any document in Weingarten's possession, or that

Weingarten's pretrial witness interview notes were Jencks Act materials.

There was no failure by the government to disclose information favorable to Petitioner before trial. *See Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963). The first document does not contain any evidence favorable to Petitioner, and the other two documents were never in the government's possession. Thus, Petitioner has not established that the government's failure to produce these three documents violated his due process rights.

For the foregoing reasons, Petitioner's third ground for relief is without merit.

### G. *Ground 4: Perjury Trap.*

#### 1. Petitioner's Allegations.

In his fourth ground for § 2255 relief, Petitioner claims that the government prosecutors' questions to him before the grand jury on July 18, 1984, constituted a "perjury trap". He argues that the government's questions to him manufactured a perjury charge through which he was entrapped.

The Count III conviction was based upon the following question and answer:

Weingarten: Did [Holmes] ever discuss the Drew Fairchild case with you?

Nixon: No, not to the best of my recollection. I think I would recall if he had.

(Nixon Gr.J.Tr. at p. 47, l. 25 through p. 48, l. 3).

The Count IV conviction was based upon the following exchange:

Weingarten: All right. Judge, do you have anything you want to add?

Nixon: ... Now, I have had nothing whatsoever officially or unofficially to do with the Drew Fairchild criminal case in federal court or state court ... I have never handled any part of it, never had a thing to do with it at all and never talked to anyone, state or federal, prosecutor or judge, in any way [to] influence anybody with respect to this case....

(Nixon Gr.J.Tr. at p. 75, ll. 14–15, p. 76, ll. 10–13, & p. 76, l. 23 through p. 77, l. 1).

#### 2. Perjury Trap—Legal Standards.

The perjury trap theory is founded upon the Due Process Clause prohibition against "outrageous government misconduct." *United States v. Simone*, 627 F.Supp. 1264, 1268 (D.N.J.1986); *see Hampton v. United States*, 425 U.S. 484, 495 n. 7, 96 S.Ct. 1646, 1653 n. 7, 48 L.Ed. 2d 113 (1976) (Powell, J., concurring) ("demonstrable level of outrageousness"). "The 'perjury trap' theory asserts that prosecutorial misconduct designed to trap a witness into perjuring himself before a grand jury is misconduct so severe as to constitute a violation of the witness' due process rights." *United States v. Phillips*, 674 F.Supp. 1144, 1146 (E.D.Pa.1987). A perjury trap occurs when the government abuses the grand jury process by using its investigatory powers to secure an indictment for perjury on matters which are not material or germane to a legitimate investigation of the grand jury. *United States v. Crisconi*, 520 F.Supp. 915, 920 (D.Del. 1981).

In order to establish a perjury trap, Petitioner must establish that his testimony had no tendency to support any possible action of the grand jury within its investigatory role and that the grand jury called him to testify with the purpose of eliciting perjury. *Brown v. United States*, 245 F.2d 549, 555 (8th Cir.1957). Petitioner must establish that the prosecutor questioning him before the grand jury had a "premeditated design" and a "sole or primary purpose" to trap him into committing perjury through unfair means. *United States v. Caputo*, 633 F.Supp. 1479, 1486 (E.D.Pa.1986), *rev'd on other ground sub nom. United States v. Martino*, 825 F.2d 754 (3rd Cir.1987); *Simone*, 627 F.Supp. at 1269; *see generally* Gershman, *The "Perjury Trap"*, 129 U.Pa.L.Rev. 624, 683–687 (1981). If the questions posed to the witness are material to a legitimate grand jury

investigation, then the government has not elicited or caused the perjury and there generally can be no perjury trap. *See United States v. Nickels*, 502 F.2d 1173, 1176 (7th Cir.1974), *cert. denied*, 426 U.S. 911, 96 S.Ct. 2237, 48 L.Ed.2d 837 (1976); *Masinia v. United States*, 296 F.2d 871, 877 (8th Cir.1961); *Brown*, 245 F.2d at 555.

### 3. Discussion.

 Initially, the Court notes certain fatal flaws in Petitioner's perjury trap claim. A determinative issue of a perjury trap claim is whether the allegedly perjurious testimony was material to the grand jury's investigation. *See Nickels*, 502 F.2d at 1176; *Masinia*, 296 F.2d at 877.[13] The Court concludes that the questioning to which Petitioner objects was material to the grand jury's investigation. The grand jury was investigating whether Drew Fairchild's state court criminal case was corruptly influenced by Petitioner or others. The federal prosecutors had received allegations from Skip Jarvis that Petitioner interceded for Drew because Petitioner had obtained mineral interests from Wiley Fairchild. The evidence indicated that the conveyance documents and the promissory notes for those investments were executed after the Hattiesburg Airport drug bust, but were backdated to reflect an execution date prior to the drug bust. At the time of Petitioner's testimony before the grand jury, the grand jury and the government did not have any information that either Holmes or Wiley Fairchild had discussed Drew's criminal case with Petitioner. Thus, it was clearly material to the grand jury's investigation to hear testimony from Petitioner about his receipt of the mineral interests from Wiley Fairchild, about the backdating of the conveyance documents and the promissory notes and about any discussions he had with Holmes or Wiley Fairchild about Drew's criminal case. Weingarten's question, "Did [Holmes] ever

discuss the Drew Fairchild case with you?," was material to the grand jury's investigation. Hence, it did not constitute a perjury trap.

A perjury trap claim also requires proof of an unlawful purpose for the government calling the witness to testify before the grand jury. *Brown*, 245 F.2d at 555. Petitioner was not called or compelled to testify before the grand jury. Rather, he voluntarily appeared and testified. Moreover, he concedes that the prosecutor had a legitimate purpose in questioning him there. He merely disputes the legitimacy of the Count III question. (Pet.Memo. in Supp. of Mot. to Vac. at p. 46).

 The perjury trap claim is relevant only to the Count III conviction. It has no application to the Count IV conviction, because Petitioner's testimony upon which that conviction is based is his own voluntary narrative statement. It was given in response to Weingarten's open-ended invitation to Petitioner to speak to the grand jury: "All right. Judge, do you have anything you want to add?" (Nixon Gr.J. Tr. at p. 75, ll. 14–15). Petitioner's subsequent narrative testimony (Nixon Gr.J.Tr. at p. 75, l. 17, through p. 79, l. 16), was material to the grand jury's investigation, was not elicited by specific questioning and was not induced by any government misconduct.

Petitioner's perjury trap claim is substantially premised upon two arguments: first, that Weingarten actively misled Petitioner during the April interview when he told Petitioner that the government did not have any information which showed a connection between Petitioner and the handling or disposition of the Drew Fairchild criminal case; and, second, that Weingarten knowingly and intentionally trapped Petitioner into committing perjury during his grand jury appearance because Weingarten had no legitimate reason to ask: "Did [Holmes] ever discuss the Drew Fairchild case with you?" Petitioner so contends

---

**13.** This issue was determined adversely to Petitioner in the trial when District Judge Meredith ruled that Petitioner's testimony, which formed the basis for Counts III and IV, was material to the grand jury's investigation. On direct appeal, Petitioner did not challenge this ruling. *United States v. Nixon*, 816 F.2d at 1029. Although this ruling is likely dispositive of the perjury trap issue, the Court will consider this materiality question because of Petitioner's reliance on the perjury trap theory.

because Weingarten already knew (based upon the April interview) that Petitioner's answer would be: "No."

With respect to the first of these arguments, Petitioner wholly distorts the meaning of Weingarten's statement to Petitioner's question by removing it from the context of the entire interview. During the interview, Weingarten unambiguously informed Petitioner that the government was investigating Petitioner's mineral royalty investments with Wiley Fairchild, because the government had a confidential informant who alleged that there was an illicit connection between Petitioner and the Drew Fairchild criminal case. (Int.Tr. at pp. 37–38). Likewise, Weingarten clearly told Petitioner that the reason he asked him whether Holmes or Wiley Fairchild had ever discussed Drew's criminal case with him was to determine if there was any connection between Petitioner and the case. (Int.Tr. at pp. 46–47). Further, in their discussion, Weingarten and Petitioner discussed the fact that troubling questions were raised by the execution of and backdating of the conveyance documents and the promissory notes, to reflect an execution date prior to the drug bust.

In this context, Weingarten's statement meant that, other than the confidential informant's allegations and the backdating of the conveyance documents and the promissory notes, the government did not at that time have any information showing a connection between Petitioner and the handling or disposition of the Drew Fairchild criminal case. Moreover, until October 30, 1984, when Mississippi Attorney General Ed Pittman and Baltar spoke to FBI Agent Kennedy, the government did not have any information showing such a connection. Thus, Weingarten's statement was truthful and not misleading.

Petitioner's reliance upon *Cox v. Louisiana*, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965), *Raley v. Ohio*, 360 U.S. 423, 79 S.Ct. 1257, 3 L.Ed.2d 1344 (1959), and *Johnson v. United States*, 318 U.S. 189, 63 S.Ct. 549, 87 L.Ed. 704 (1943), is unavailing. In *Cox*, local officials misled Cox when they told him that he could legally demonstrate at a specific location. When he later demonstrated there, he was charged with a crime. 379 U.S. at 571, 85 S.Ct. at 484. In *Raley*, the defendants were misled by the members of the Ohio legislative committee who erroneously told the defendants that they could validly assert their privilege against self-incrimination. 360 U.S. at 437–438, 79 S.Ct. at 1265–1266. In *Johnson*, the trial court misled Johnson by granting him his claim of privilege against self-incrimination and then allowing the prosecutor to comment during closing argument on Johnson's claim of privilege. 318 U.S. at 196–197, 63 S.Ct. at 553. Petitioner has not shown any misleading of him by the government either during the April interview or during his grand jury appearance. The Court concludes that this first argument is factually and legally without merit.

Concerning Petitioner's second argument (that Weingarten knew that Petitioner's answer to the question, "Did [Holmes] ever discuss the Drew Fairchild case with you?" would be, "No"), Weingarten did not commit prosecutorial misconduct by asking the question. Weingarten did not at that time have any information that Petitioner's answer would be perjurious. Further, Petitioner's "No" answer was material to the grand jury's investigation into the handling and disposition of the Drew Fairchild criminal case. Weingarten had a legitimate purpose for asking the question and there is no basis for concluding that Weingarten knowingly and intentionally asked the question in order to trap Petitioner into lying. Therefore, this second argument is factually without merit.

Petitioner's remaining arguments in support of his perjury trap claim are equally without merit. Weingarten's question was not "innocuous-seeming and ambiguous." (Pet.Memo. in Supp. of Mot. to Vac. at p. 45). Rather, the question pointedly sought to determine whether there was any contact between Petitioner and Holmes regarding the Drew Fairchild criminal case. It strains credulity to believe that Petitioner, an experienced federal judge, could find that Weingarten's question was innocuous and ambiguous, when that question is considered in the context of Weingarten's thor-

ough questioning about his investments with Wiley Fairchild, (Nixon Gr.T.Tr. at pp. 5–44), and his knowledge of the Drew Fairchild criminal case. (Nixon Gr.J.Tr. at pp. 45–50). The juxtaposition of these lines of questioning refutes the argument that the question was "innocuous-seeming." Nor was the question ambiguous. *United States v. Nixon*, 816 F.2d at 1029. Petitioner's answer was not ambiguous and it was not truthful.[14] His answer to Weingarten's question was an absolute, unwaivering, "No." (Nixon Gr.J.Tr. at p. 48, ll. 2–3). Thus, there was no reason whatsoever for Weingarten to continue the line of questioning with follow-up questions.

Based upon the foregoing, the Court concludes that Petitioner has not made even a colorable showing that Weingarten's questioning constituted a perjury trap. Therefore, Petitioner's fourth ground for relief is without merit.

### H. *Ground 5: Challenges to the Prosecution.*

#### 1. Petitioner's Allegations.

As his fifth ground for relief, Petitioner alleges that, in violation of his due process rights, the government prosecutors "targeted [Petitioner] for investigation with improper motives and purposes and through improper means." Petitioner charges the government with prosecutorial misconduct

during the investigatory and grand jury stages of the proceedings against him. He argues that the government intentionally obtained federal indictments charging Wiley Fairchild, Holmes, Stocks, and Lewis with baseless charges [15] in order to induce and coerce them into providing incriminating evidence against him. Petitioner also charges that the government wrongfully allowed Wiley Fairchild to testify before the grand jury on November 28, 1984, that he thought that one Preacher Shows had been able to obtain a reduction in his son's sentence by paying Holmes to intercede with Petitioner, despite the government's knowledge that Petitioner was not the federal judge who handled any aspect of the son's case. In addition, Petitioner argues that the government investigated his investments with Wiley Fairchild and prosecuted him on the gratuity and perjury charges, in order to retaliate against him for rendering the $6.1 million judgment in the Petit Bois Island condemnation proceedings.[16]

#### 2. Prosecutorial Misconduct.

Petitioner's overriding argument in this fifth ground for relief is that the government's methods and motive during its investigation of him constituted pretrial prosecutorial misconduct which requires that his convictions be overturned. In deter-

---

14. Petitioner's own trial testimony demonstrates that his answer to Weingarten's question was not truthful. First, at his trial, petitioner testified that, sometime after January 26, 1983, but before March 11, 1983, he spoke to Holmes and (commenting generally on the media accounts of Holmes' handling of the Drew Fairchild criminal case) said: "Well Holmes, you screwed up again." (Tr.Tr. at pp. 1525–1526). Second, at his trial, Petitioner testified that, on March 11, 1983, he said to Holmes: "Bud, I've been talking to Wiley Fairchild. And ... he is accusing you of blackmailing him ... with reference to this matter some matter with his son." Holmes responded: "The son of a bitch is paranoid.... Everybody is after his money, he's got so much he'll never be able to spend it, he's crazy." Then Holmes said: "Let me tell you about the case." Petitioner responded: "Bud, I don't want to hear about the case." Holmes said: "Well, the thing's all worked out anyway. I don't understand what he's talking about." (Tr.Tr. at pp. 1538–1539).

15. The grand jury indicted Wiley Fairchild on one count of paying an illegal gratuity to Petitioner in the form of the mineral royalty investments and one count of perjury based upon Fairchild's prior grand jury testimony. It indicted Holmes on four counts of grand jury perjury and one count of obstruction of justice. Stocks was indicted on three counts of perjury and one count of obstruction of justice. Lewis was indicted on one count of perjury and one count of aiding and abetting Stocks' obstruction of justice.

16. During this § 2255 proceeding, the Court denied Petitioner discovery relating to Petit Bois Island. The Court did so because Petitioner's initial showing in support of his retaliation theory, when gauged against the legal standards which govern on that theory, was insufficient to warrant discovery or an evidentiary hearing. *See infra* footnote 1. On this basis, Petitioner's discovery request amounted to no more than a fishing expedition.

mining his entitlement to relief on this basis, this Court must employ the harmless error standard to determine whether Petitioner suffered any prejudice as a result of any pretrial prosecutorial misconduct. *United States v. Mechanik,* 475 U.S. 66, 70–73, 106 S.Ct. 938, 941–943, 89 L.Ed.2d 50 (1986); *United States v. Hasting,* 461 U.S. 499, 505–509, 103 S.Ct. 1974, 1978–1980, 76 L.Ed.2d 96 (1983); *see Bank of Nova Scotia v. United States,* —— U.S. ——, 108 S.Ct. 2369, 2374, 101 L.Ed.2d 228 (1988). This Court must determine whether, on the whole record, any proven pretrial prosecutorial misconduct, measured by the jury's guilty verdicts, was harmless beyond a reasonable doubt. *Mechanik,* 475 U.S. at 70, 106 S.Ct. at 941; *Hasting,* 461 U.S. at 510, 103 S.Ct. at 1981; *see Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

■ Petitioner has not shown that the charges against Fairchild and Holmes were baseless. Rather, the record before this Court demonstrates that the charges against Fairchild and Holmes were factually supported.[17]

Although Petitioner charges that the government brought baseless charges against Fairchild and Holmes in order to induce them to provide damaging and incriminating evidence against him, he does not allege in support of this ground that their evidence against him was false. Without such an allegation, any proven pretrial prosecutorial misconduct directed against these men is harmless error beyond a reasonable doubt.

To the extent Petitioner does contend elsewhere that Fairchild and Holmes provided false evidence against him, he has not shown that they testified falsely at his trial on any historical facts material to Counts III and IV. The Court rejects Wiley Fairchild's testimony at the § 2255 evidentiary hearing that his trial testimony on material historical facts was false. Finally, even if Petitioner had proven the falsity of Fairchild's and Holmes' trial testimony, there is no evidence whatsoever that the government knew it was false.

■ The Court concludes that the government did not commit prosecutorial misconduct by allowing Wiley Fairchild to testify before the grand jury about the Shows matter. Although Preacher Shows did not obtain a reduction in his son's sentence by paying Holmes to intercede with Petitioner, Wiley Fairchild's *belief* that this event had occurred was relevant to the grand jury's investigation. It was for this reason that he believed that he "could 'deal' with Judge Nixon." (Wiley Fairchild, Nov. 28, 1984, Gr.J.Tr. at p. 24, ll. 18–19).[18]

■ Moreover, during the government's direct examination of Wiley Fairchild at Petitioner's trial, the government did not elicit any testimony about the Shows matter. The Shows matter had no bearing whatsoever on whether Petitioner perjured himself in his testimony before the grand jury. Thus, any prosecutorial misconduct during the grand jury proceeding regarding the Shows matter, which the Court does not find, would have constituted harmless error beyond a reasonable doubt.[19]

---

**17.** Because Stocks and Lewis did not testify at Petitioner's trial, any proven pretrial prosecutorial misconduct directed against them is irrelevant and would constitute harmless error beyond a reasonable doubt.

**18.** Apparently, the grand jury later was advised that Petitioner was not the federal judge in Dr. Shows' case and that Dr. Shows' motion for reduction of sentence was denied. (*See* Tr.Tr. at pp. 779–780).

**19.** On cross-examination of Wiley Fairchild, Petitioner's attorney elicited the substance of Fairchild's grand jury testimony regarding the Shows matter. (Tr.Tr. p. 696, l. 3, through p.

704, l. 4). On redirect-examination, the government elicited that Fairchild's source for this information was Preacher Shows and not the Petitioner. (Tr.Tr. p. 713, l. 19 through p. 716, l. 2). The jury was clearly advised that Petitioner was not the federal judge in Dr. Shows' case and was clearly advised that Dr. Shows' motion for reduction of sentence was denied. (Tr.Tr. p. 704, ll. 1–6). (*See* Tr.Tr. p. 775, l. 18 through p. 776, l. 12, and p. 779, l. 14 through p. 780, l. 18 [Holmes] ). The government did not commit any prosecutorial misconduct at Petitioner's trial regarding the Shows matter.

Petitioner charges that the government investigated and prosecuted him in order to retaliate against him for the Petit Bois Island condemnation judgment. Based upon the sequence of events in this case as set forth in Section B above, the Court concludes that Petitioner has not shown such a retaliatory purpose. Rather, Jarvis' allegations and the fact that the royalty conveyance documents were backdated motivated the government to investigate Petitioner. That information, supplemented by the information provided by Wiley Fairchild, Holmes and Ingram motivated the government to prosecute him. Any retaliatory purpose, which the Court does not find, would constitute harmless error beyond a reasonable doubt, because it would have no bearing upon whether Petitioner committed perjury.

For the foregoing reasons, the Court concludes that Petitioner has not established that any prosecutorial misconduct occurred, requiring that his conviction be overturned.

### 3. Prosecutorial Vindictiveness.

Petitioner cites cases where convictions have been overturned on due process grounds for prosecutorial vindictiveness. However, the prosecutorial vindictiveness theory applies only when the prosecutor acts adversely to the criminal defendant in a pending criminal proceeding in direct response to, and to penalize or retaliate against the defendant for, the defendant's prior exercise and invocation of constitutional or statutory rights during the course of the criminal proceeding. *Thigpen v. Roberts,* 468 U.S. 27, 104 S.Ct. 2916, 82 L.Ed.2d 23 (1984); *United States v. Goodwin,* 457 U.S. 368, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982); *Bordenkircher v.*

*Hayes,* 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed. 2d 604 (1978); *Blackledge v. Perry,* 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974); *Byrd v. McKaskle,* 733 F.2d 1133 (5th Cir.1984); *United States v. Krezdorn,* 718 F.2d 1360 (5th Cir.1983), *cert. denied,* 465 U.S. 1066, 104 S.Ct. 1416, 79 L.Ed.2d 742 (1984). Petitioner was not a criminal defendant during any of the supposed acts of prosecutorial misconduct alleged in his motion to vacate. He has not identified any constitutional or statutory right which he exercised or invoked as a criminal defendant after his indictment (either before or after his trial) to which the prosecutor responded vindictively. He has not identified any prosecutorial action which was a vindictive response to any prior action of his as a criminal defendant. In sum, the prosecutorial vindictiveness theory is factually unsupported.

### 4. Bad Faith Prosecution.

Petitioner cites cases where federal courts have enjoined bad faith state criminal prosecutions under *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).[20] Petitioner contends that his prosecution was retaliatory and brought in bad faith within the meaning of the *Younger*-exception cases, because the government prosecuted him in order to retaliate for the Petit Bois Island condemnation judgment. He argues that, if federal courts can enjoin state criminal retaliatory bad faith prosecutions, then federal courts can enjoin similar federal criminal prosecutions and can overturn federal criminal convictions obtained pursuant to retaliatory bad faith prosecutions.

This Court entertains doubts that federal courts can overturn federal criminal convictions based upon challenges to the prosecu-

**20.** Under *Younger,* "abstention is appropriate, where absent bad faith, harassment, or a patently invalid statute, federal jurisdiction has been invoked for the purpose of restraining state criminal proceedings." *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 816, 96 S.Ct. 1236, 1245, 47 L.Ed.2d 483 (1976); *see Younger,* 401 U.S. at 49, 53–54, 91 S.Ct. at 753, 754–755. Thus, as an exception to *Younger* abstention, federal courts can enjoin state criminal bad faith prosecutions. *Smith v.*

*Hightower,* 693 F.2d 359 (5th Cir.1982); *Rowe v. Griffin,* 676 F.2d 524 (11th Cir.1982); *Fitzgerald v. Peek,* 636 F.2d 943 (5th Cir.), *cert. denied,* 452 U.S. 916, 101 S.Ct. 3051, 69 L.Ed.2d 420 (1981). Also, as an exception to *Younger* abstention, "federal courts have the power to enjoin state criminal proceedings that would constitute double jeopardy." *Davis v. Herring,* 800 F.2d 513, 516 (5th Cir.1986); *Showery v. Samaniego,* 814 F.2d 200, 201 n. 5 (5th Cir.1987).

torial decisions, unless the defendant proves a selective prosecution equal protection violation. *See Wayte v. United States,* 470 U.S. 598, 607–610, 105 S.Ct. 1524, 1530–1532, 84 L.Ed.2d 547 (1985). Nevertheless, the Court will assume that the Fifth Circuit would conclude that federal courts can overturn federal criminal convictions obtained pursuant to retaliatory bad faith prosecutions. *See Smith v. Meese, Attorney General of the United States,* 821 F.2d 1484, 1490–1493 (11th Cir. 1987); *United States v. Johnson,* 577 F.2d 1304 (5th Cir.1978). However, this Court finds below that Petitioner fails to establish that his prosecution was retaliatory or brought in bad faith.

The Fifth Circuit decision of *Wilson v. Thompson,* 593 F.2d 1375 (5th Cir.1979), sets forth a three-step procedure for determining whether a plaintiff has established that a state criminal prosecution of him is retaliatory and brought in bad faith:

> The Court should consider whether the plaintiff[ ] [has] shown, first, that the conduct allegedly retaliated against or sought to be deterred was constitutionally protected, and, second, that the State's bringing of the criminal prosecution was motivated at least in part by a purpose to retaliate for or to deter that conduct. If the Court concludes that the plaintiff[ ] [has] successfully discharged [his] burden of proof on both of these issues, it should then consider a third; whether the State has shown by a preponderance of the evidence that it would have reached the same decision as to whether to prosecute even had the impermissible purpose not been considered.

593 F.2d at 1387 (footnote omitted). *Accord Smith v. Hightower,* 693 F.2d 359, 369 (5th Cir.1982); *Fitzgerald v. Peek,* 636 F.2d 943 (5th Cir.), *cert. denied,* 452 U.S. 916, 101 S.Ct. 3051, 69 L.Ed.2d 420 (1981). Under the *Wilson* three-step procedure, the plaintiff must show that a constitutionally impermissible retaliatory purpose was a motivating factor in the state's decision to prosecute. *Wilson,* 593 F.2d at 1387. The Court should examine the strength of the government's evidence and the seriousness of the criminal charges. *Smith v. High-*

*tower,* 693 F.2d at 369; *Wilson,* 593 F.2d at 1387 n. 22. Strong evidence of criminal violations or evidence of serious criminal violations supports an inference that the prosecutor, in deciding to prosecute, was not influenced by a retaliatory bad faith purpose and instead was fulfilling his duty to bring evidence of criminal activity to the grand jury's attention. *Smith v. Hightower,* 693 F.2d at 369 & n. 25.

 Petitioner argues that his conduct in rendering the Petit Bois Island condemnation judgment against the government caused his prosecution. The Court believes that rendering the judgment was conduct constitutionally protected by Article III and by the First Amendment, and concludes that Petitioner satisfies the first *Wilson* step.

 However, Petitioner fails to satisfy the second *Wilson* step. He has not shown that the government, in deciding to prosecute him on the gratuity and perjury charges, was motivated in any part by a purpose to retaliate for the Petit Bois Island condemnation judgment. Rather, the government properly investigated his affairs because it had received substantial information that his investments with Wiley Fairchild were corruptly connected to Drew Fairchild's drug case. The government's investigation of Petitioner's affairs uncovered strong evidence that he had committed serious violations of the law and breaches of the public trust by accepting an illegal gratuity and by committing perjury in his grand jury testimony. The government's decision to prosecute Petitioner on the gratuity and perjury charges was motivated and supported by the evidence that had been uncovered during that investigation.

For the foregoing reasons, Petitioner fails to establish that his prosecution was retaliatory or brought in bad faith.

5. Selective Prosecution.

Petitioner contends that the government engaged in impermissible selective prosecution when it prosecuted him in order to retaliate against him for the Petit Bois

Island condemnation judgment. In order to prevail on his claim of selective prosecution, he must establish two requirements, which the Fifth Circuit characterizes as a "heavy burden." *United States v. Jennings*, 724 F.2d 436, 445 (5th Cir.), *cert. denied*, 467 U.S. 1227, 104 S.Ct. 2682, 81 L.Ed.2d 877 (1984).

First, [defendant] must make a *prima facie* showing that he has been singled out for prosecution although others similarly situated who have committed the same acts have not been prosecuted. Second, having made the first showing, he must then demonstrate that the government's selective prosecution of him has been constitutionally invidious. The showing of invidiousness is made if [defendant] demonstrates that the government's selective prosecution is actuated by constitutionally impermissible motives on its part, such as racial or religious discrimination.

724 F.2d at 445 (citations omitted). *Accord United States v. Ramirez*, 765 F.2d 438, 439–440 (5th Cir.1985), *cert. denied*, 474 U.S. 1063, 106 S.Ct. 812, 88 L.Ed.2d 786 (1986); *United States v. Hoover*, 727 F.2d 387, 389 (5th Cir.1984). "If a defendant meets both these requirements, then the burden shifts to the government to demonstrate a legitimate basis for selecting the defendant for prosecution." *Hoover*, 727 F.2d at 389. Selective prosecution challenges to convictions are equal protection claims. The Equal Protection Clause mandates that the government's decisions to prosecute may not be motivated by discriminatory purpose and may not be " 'deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification,' . . . including the exercise of protected statutory and constitutional rights." *Wayte v. United States*, 470 U.S. 598, 608, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547 (1985) (*quoting Bordenkircher v. Hayes*, 434 U.S. 357, 364, 98 S.Ct. 663, 668, 54 L.Ed.2d 604 (1978)).

 Petitioner has not shown that he was singled out for prosecution while another similarly situated person was not prosecuted. He has not identified any other public official against whom there was strong evidence of criminal conduct similar to that in this case who was not prosecuted. Moreover, Petitioner has not shown that the government's decision to prosecute him was actuated by constitutionally invidious motives. A prosecutorial decision actuated by a motive to retaliate against an individual for his exercise of his constitutionally protected Article III and First Amendment rights would be constitutionally invidious. *Wayte*, 470 U.S. at 608, 105 S.Ct. at 1531. However, Petitioner has not shown that the government's decision to prosecute him was actuated by a motive to retaliate against him for his exercise of his Article III or First Amendment rights. Rather, the government prosecuted him on the gratuity and perjury charges because there was strong evidence that he had committed those serious crimes.

For the foregoing reasons, Petitioner has not established that the government impermissibly, selectively prosecuted him.

### 6. Outrageous Government Conduct.

 Petitioner contends that the investigatory techniques which the government allegedly employed to obtain evidence against him (bringing untenable charges against potential witnesses, allowing false testimony before the grand jury) and the government's alleged investigatory motive (retaliation against him for his constitutionally protected Article III and First Amendment conduct) were so outrageous as to transcend due process limits of fundamental fairness. The outrageous government conduct theory focuses specifically on government misconduct during the investigatory stages of criminal proceedings. It recognizes that "the conduct of law enforcement authorities" during an investigation may be "sufficiently offensive" so as to offend due process. *Hampton v. United States*, 425 U.S. 484, 497, 96 S.Ct. 1646, 497, 48 L.Ed.2d 113 (1976) (Brennan, J., dissenting); *Id.* at 495 & 495 n. 7, 96 S.Ct. at 1652 & 1653 n. 7 (Powell, J., concurring); *see United States v. Russell*, 411 U.S. 423, 431–432, 93 S.Ct. 1637, 1642–1643, 36 L.Ed. 2d 366 (1973). *Accord United States v. Arteaga*, 807 F.2d 424, 426–427 (5th Cir.

1986); *United States v. Arthur Thomas Nixon*, 777 F.2d 958, 963–964 (5th Cir. 1985); *United States v. Nations*, 764 F.2d 1073, 1077 (5th Cir.1985); *United States v. Yater*, 756 F.2d 1058, 1065 (5th Cir.), *cert. denied*, 474 U.S. 901, 106 S.Ct. 225, 88 L.Ed.2d 226 (1985). However, this theory requires proof of "government overinvolvement in the crime charged," "government orchestrated and implemented criminal activity," and the passive involvement of the defendant with the crime. *Nations*, 764 F.2d at 1077; *Yater*, 756 F.2d at 1065–1066. Petitioner's allegations of improper investigatory techniques and motives do not speak to or implicate these elements of the outrageous government conduct theory. *Cf.* Section G above (Perjury Trap). He has failed to show entitlement to relief on this basis.

For all the foregoing reasons, Petitioner's fifth ground for relief is without merit.

## I. *Conclusion.*

As stated at the beginning of this opinion, this is not a typical § 2255 proceeding. In lieu of the standard claims generally asserted in such cases, Petitioner alleges that he was victimized by egregious forms of prosecutorial misconduct.[21] No court could treat such charges lightly and the length of this decision is some indication of

this Court's attempt to fully consider every contention.

Setting aside all legal jargon, the convictions before this Court are based on a simple set of facts:

Acting on information supplied by an informant, the government convened a special grand jury for the purpose of determining whether the Petitioner (and others) acted improperly regarding Drew Fairchild's drug case. Petitioner voluntarily appeared before that grand jury. He denied discussing the case with Prosecutor Holmes and denied having anything to do with it or trying to influence anyone with respect to it. Subsequently, he was charged with certain violations of the law, including two counts of perjury with respect to these denials. He was found guilty by a jury of the two perjury counts arising from such denials.

In conducting these post-conviction proceedings, this Court did not retry the issue of guilt. That question was for the jury. This Court's duty was to determine whether the pre-trial or the trial processes were so flawed that, under the law, Petitioner's convictions should be set aside. This Court does not so find. Petitioner's motion for relief under 28 U.S.C. § 2255 (as amended)

---

21. Some of Petitioner's arguments are exaggerated. For example, the statements that Wiley Fairchild's admission of perjury "was both moving and deeply disturbing" (Pet. Post–H.Br. at p. 31) and that Fairchild "was lured and stampeded into perjury" (*Id.* at p. 31) are ludicrous! This Court was "deeply disturbed" by Wiley Fairchild's testimony because it was patently clear that truth has become a stranger to him! Another example is counsel's suggestion of impropriety in Reid Weingarten's dealing directly with John Baltar instead of Wiley Fairchild's counsel. At first blush, this contention gets a court's attention. However, after a more complete study of the total picture at that time, it is easy to understand how this arrangement developed. Wiley Fairchild obviously distrusted lawyers and disliked paying fees; Baltar was his buffer, his middle man; Fairchild had used Baltar as his agent in most dealings with third parties. Wiley's plea agreement had been reached and his plea of guilty accepted. Weingarten was the attorney with primary responsibility for this case. Apparently, Barry Hess and Wallace Gunn who then represented Fairchild had no objection to this procedure. Under these circumstances, it is not unusual for a "cooperating" defendant-witness to meet with government representatives without his counsel being present.

Petitioner's brief contained serious accusations of misconduct directed personally against Prosecutor Weingarten: "Headlong determination to trap a federal judge" (Pet. Memo. in Supp. of Mot. to Vac. at p. 5); "Weingarten's overheated investigation" (*Id.* at p. 8); "driving Mr. Fairchild to bear false witness" (*Id.* at p. 31); "a prosecutor who cared only for a conviction, not for the truth" (*Id.* at p. 31). The Court finds these and other similar accusations to be unfounded.

This Court is not so naive as to close its eyes to the attractiveness of a federal judge as a target for overzealous prosecutors, fueled by a gloating media. However, the evidence before this Court has fallen measurably short of proving that Petitioner was so targeted or of proving the type of prosecutorial misconduct required to set aside a jury verdict.

is without merit. Accordingly, the motion is denied on its merits.